TRAMMEL CROW COMPANY
NO. 60, et al., Petitioners,

v.

William Jefferson HARKINSON and
Jeff Harkinson Investments,
Inc., Respondents.

No. 95–1255.

Supreme Court of Texas.

Argued Oct. 24, 1996.

Decided March 21, 1997.

Rehearing Overruled June 6, 1997.

Kim M. Meaders, Douglas C. Kittleson, Edward P. Perrin, Jr., Dallas, for petitioners.

William Pannill, Roy L. Barnes, Houston, for respondents.

ENOCH, Justice, delivered the opinion of the Court, in which HECHT, CORNYN, SPECTOR, OWEN and BAKER, Justices, join.

The issue in this case is whether a real estate broker's claims for tortious interference with contract and prospective business relations and civil conspiracy to tortiously interfere are barred under the Texas Real Estate License Act absent a signed written commission agreement. The court of appeals held these claims were not barred. 915 S.W.2d 28. Because we conclude that the broker's claims for tortious interference and civil conspiracy are in essence claims to recover a commission in violation of section 20(b) of the Real Estate License Act, TEX. REV.CIV. STAT. ANN. art. 6573a (Vernon Supp. 1997), we reverse that part of the judgment of the court of appeals and render judgment that the broker take nothing on these claims.

Patterson/McLaine Group, Inc., authorized William Jefferson Harkinson, a licensed real estate broker, to act as its exclusive representative in locating rental space for Hunt Products Company, Inc. The exclusive representation agreement between Patterson/McLaine and Harkinson expressly provided that Harkinson "will look solely to the landlord/owner for his fee...." Harkinson found suitable space on LaReunion Parkway in Dallas. The property was owned by Trammell Crow No. 60 (Crow 60) and Petula Associates, Ltd., a joint venture. Trammell Crow Dallas Industrial (Crow Industrial) managed the property.

Upon finding the property, Harkinson began negotiating his commission and a lease with Richard Strader of Crow Industrial. Strader told Harkinson that the owners of the property would pay a 4½ percent cash commission to an outside broker who brought in a tenant for the space. Strader sent Harkinson an unsigned commission agreement providing for a 4½ percent up-front cash commission or a commission of 6 percent of each month's rental over the life of the lease. Harkinson redrafted the commission agreement making various changes in its terms, including providing for only a 4½ percent up-front cash commission. He signed the revised agreement and returned it to Strader to be signed by the owners. Neither the owners nor their agent ever signed any commission agreement with Harkinson.

Harkinson negotiated a lease for over $7,000,000. Seeking to reduce its rental obligation, Dan Patterson of Patterson/McLaine, without Harkinson's knowledge, agreed with

the owners that they would pay Harkinson a commission of $30,000, considerably less than the $346,500 Harkinson would have received if he were paid a 4½ percent commission. Harkinson refused the $30,000 commission and sued Crow 60, Petula, Crow Industrial, Strader and his immediate supervisor, Thomas Lieser, Petula's parent corporation, Principal Mutual Life Insurance Company and its agent, Douglas D. Achtemeier (collectively, the Crow defendants), and Patterson/McLaine, Dan Patterson, and Hunt Products Company, Inc. (collectively, the Hunt defendants) for the loss of his commission. Harkinson alleged fraud, breach of contract, breach of the duty of good faith and fair dealing, tortious interference with contract and prospective business relations, and civil conspiracy.

All defendants moved for summary judgment, asserting that, absent a written commission agreement, Harkinson's claims were barred by section 20(b) of the Texas Real Estate License Act (RELA). Tex.Rev.Civ. Stat. Ann. art. 6573a, § 20(b). The trial court granted summary judgment for the defendants on all claims. The court of appeals reversed the summary judgment on Harkinson's tortious interference and civil conspiracy claims, concluding that although Harkinson lacked an enforceable commission agreement, that uneforceability was not a defense to tortious interference. 915 S.W.2d at 33. For the reasons stated below, we conclude that Harkinson's tortious interference and civil conspiracy claims are precluded under section 20(b) of RELA.

# I

Section 20(b) of RELA specifically provides:

An action may not be brought in a court in this state for the recovery of a commission for the sale or purchase of real estate unless the promise or agreement on which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged or signed by a person lawfully authorized by him to sign it.

Tex.Rev.Civ. Stat. Ann. art. 6573a, § 20(b).

Harkinson does not have a signed written commission agreement from anyone. He has two agreements, neither of which comport with section 20(b). He has a written exclusive representation agreement with the Hunt defendants. That agreement, though signed and in writing, simply is not a commission agreement. To the contrary, the exclusive representation agreement provides only that Harkinson must negotiate whatever commission he is to receive, if any, with the prospective lessor. Harkinson also has an oral promise from the owners to pay him a 4½ percent up-front commission. This agreement, though a commission agreement, is neither written nor signed by the party to be charged, the owners. Section 20(b) precludes enforcement of either of these contracts to recover a commission.

Given that his contract actions are barred by section 20(b), Harkinson asserts that section 20(b) does not preclude his tortious interference claims for two reasons. First, he asserts that his claims are not for the recovery of a commission, but for tort damages resulting from the tortious interference with his oral commission agreement and the exclusive representation agreement. Second, section 20(b) does not bar his claims, Harkinson contends, because of our decision in *Clements v. Withers*, 437 S.W.2d 818 (Tex.1969). In *Clements*, we stated that although a written commission agreement was unenforceable under section 20(b), its uneforceability did not give third parties the right to interfere with the performance of oral contracts. 437 S.W.2d at 821. We find neither proposition persuasive.

# A

Harkinson's claims, though couched in terms of a tort, are for the recovery of a real estate commission. *Cf. Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex.1991)(considering contract and tort liabilities arising from the same conduct and injury). For each cause of action stated in his petition, Harkinson alleges that the defendants' conduct damaged him in the amount of at least $346,500, the amount of his commission had the owners paid a 4½ percent up-front cash commission. Harkinson's pleadings belie his arguments in this

Court that his claims are not for the recovery of his commission.

Beyond the damages allegations, an examination of Harkinson's tortious interference claims reveals the fallacy of his contention that he is seeking anything other than his lost commission.

### The Oral Commission Agreement

Harkinson alleges that the Hunt defendants interfered with his oral commission agreement by knowingly and intentionally inducing Crow 60 and Petula to breach the oral commission agreement. Alternatively, Harkinson alleges that the Hunt defendants tortiously interfered with Harkinson's prospective business relation with Crow 60 and Petula by inducing the owners not to execute Harkinson's commission agreement. The allegation here is that but for the Hunt defendants' conduct, Harkinson would have been paid his 4½ percent commission. These claims unquestionably seek recovery of a real estate commission.

### The Exclusive Representation Agreement

■ Harkinson's claim for tortious interference with his exclusive representation agreement raises a more difficult question. Nevertheless, we conclude that this claim is nothing more than an indirect attempt to recover on his oral commission agreement.

Harkinson alleges that the Crow defendants interfered with his opportunity to be the exclusive representative to negotiate lease terms on behalf of Hunt Products. He alleges that the Crow defendants induced Patterson/McLaine to negotiate behind his back a lease that reduced the amount of his commission. The exclusive representation agreement, however, does not require the Hunt defendants, or any party, to pay Harkinson a commission. Accordingly, the Crow defendants' actions did not as a matter of law interfere with any contractual right to a commission.

As we read Harkinson's claim, he asserts that had the Crow defendants not interfered with his exclusive representation agreement, he would have been paid his commission as the exclusive representative negotiating a lease for Hunt Products. Harkinson cannot make out a claim for tortious interference by bootstrapping his unenforceable oral commission agreement onto his exclusive representation agreement. He cannot do indirectly what the law says he cannot do directly.

The most that can be said of Harkinson's claim for tortious interference with the exclusive representation agreement is that the Crow defendants deprived Harkinson of the opportunity to act as the exclusive representative for negotiating lease terms on behalf of Hunt Products. But even this claim is illusory and wholly derivative of his unenforceable oral commission agreement. The loss of the opportunity to negotiate exclusively on behalf of Hunt Products in this instance translates only into the loss of the expectancy of receiving a commission at the end of the lease negotiations. The Legislature, in section 20(b), has nullified any such expectancy unless the broker has a signed written commission agreement. We hold that Harkinson's claim for tortious interference with his exclusive representation agreement is in essence a claim to recover a commission in violation of section 20(b). Harkinson relies on *LA&N Interests, Inc. v. Fish*, 864 S.W.2d 745 (Tex. App.—Houston [14th Dist.] 1993, no writ), in which, on similar facts, the court of appeals reversed summary judgment on a broker's claim for tortious interference with an exclusive representation agreement. For the reasons we have just expressed, we conclude that section 20(b) precludes such claims. We disapprove of *LA & N* to the extent that it holds otherwise and permits a claim on these facts for tortious interference with the exclusive representation agreement.

Harkinson's claims for tortious interference with both his oral commission and exclusive representation agreements seek recovery of a real estate commission, either directly or indirectly, upon an oral commission agreement. His claims are barred by section 20(b) of RELA unless saved by some other law.

### B

Harkinson argues that our decision in *Clements*, 437 S.W.2d at 820–21, is that other law that preserves his claims. We disagree.

In *Clements*, a broker had a written exclusive listing agreement signed by the landowner; the broker was to find a buyer and the landowner was to pay a commission upon the sale of the land. 437 S.W.2d at 820. The buyers induced the seller to sell the land to them without paying the broker's commission. The broker sued the buyers for tortious interference with the exclusive listing agreement. Id. As a defense, the buyers asserted that the broker's claims were barred because the exclusive listing agreement was unenforceable under the predecessor to section 20(b). *Id.* There, the contract was unenforceable because the written agreement did not provide sufficient means of identifying the particular land with reasonable certainty. *Id.* Although unenforceable for this defect as between the broker and the seller, we said that the contract's uneforceability "does not give third parties the right to interfere with the performance of oral contracts." *Id.* We upheld the judgment against the buyers for tortious interference. *Id.* at 822.

Our decision in *Clements* derived, at least in part, from a subtle but critical factual distinction. In *Clements*, the landowner and the broker had a commission agreement evidenced in writing and signed by the party to be charged. *Id.* at 820. That writing violated the predecessor to section 20(b) not because the commission agreement was unwritten and unsigned, but because the writing lacked an adequate property description required by the general statute of frauds and the statute of conveyances. *Id.* This type of technical deficiency in a writing is different than a total absence of any signed writing.

■ We said in *Clements* that the written commission agreement, though unenforceable for failure to satisfy the statute of frauds and statute of conveyances, was not void or illegal, nor against public policy. *Id.* at 821. When, as in this case, there is no signed written commission agreement in the first place, public policy as expressed in section 20(b) precludes any action to recover a commission, whether sounding in tort or in contract. TEX.REV.CIV. STAT. ANN. art. 6573a, § 20(b); *see also Travel Masters, Inc. v. Star Tours, Inc.*, 827 S.W.2d 830, 833 (Tex.1991)(contract unenforceable on grounds of public policy cannot form the basis of an action for tortious interference.)

We also said in *Clements* that "to prevent fraud by those who would misrepresent verbal promises, the statutes require written proof in certain cases before performance can be enforced in the courts." 437 S.W.2d at 821. Unlike the present case, the promise enforced in *Clements* was not oral and therefore was not subject to misrepresentation. The commission to be paid was spelled out in a signed writing. Harkinson's claims against the Hunt and Crow defendants necessarily entail proof of an oral commission agreement between Harkinson and the Crow defendants. The obligation to pay and the amount of that commission are subject to misrepresentation, precisely the evil the Legislature intended to eliminate in section 20(b).

Our holding in *Clements* should be limited to its facts. While sympathetic to Harkinson's claims, those sympathies do not permit us to ignore the Legislature's unequivocal expression of intent set out in section 20(b). The Legislature was quite explicit: a broker may not recover a commission unless the commission agreement is in writing and signed by the party to be charged. TEX.REV. CIV. STAT. ANN. art. 6573a, § 20(b). Were we to expand *Clements* to cases where there is no signed written commission agreement in the first place, we would by judicial fiat eviscerate section 20(b). We decline to extend *Clements* to the tortious interference claims of a broker who asserts his or her claim for a commission absent a signed written commission agreement.

We hold that Harkinson's claims for tortious interference with contract and prospective business relations are precluded by section 20(b) of RELA. Because section 20(b) bars Harkinson's tortious interference claims, his claims for conspiracy to commit tortious interference likewise fail. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). The trial court properly rendered summary judgment against Harkinson on his tortious interference and conspiracy claims.

## II

In his cross-application, Harkinson argues that the court of appeals erred in affirming summary judgment on his promissory estoppel claim. Harkinson contends that the Crow defendants may not rely on and benefit from section 20(b) as a defense because Strader repeatedly promised Harkinson that the owners would sign the commission agreement and Harkinson relied on these promises. Harkinson relies on our decision in *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 937–38 (Tex.1972), where we recognized the doctrine of promissory estoppel as an exception to the statute of frauds.

In *"Moore" Burger*, a tenant was induced to refrain from bidding on the purchase of certain property by individuals who promised to lease the property to the tenant if they purchased the property. The tenant signed an agreement to lease and a lease, but the purchasers of the property never did, though they had promised to do so. Instead, the purchasers sold the property to a third party, who refused to honor the lease. We held that summary judgment for the purchasers was improper because the evidence raised a fact issue as to whether enforcement of the statute of frauds would itself plainly amount to a fraud. *Id.* at 938.

*"Moore" Burger* is not dispositive. *"Moore" Burger* considered the application of promissory estoppel against the general statute of frauds, now Tex. Bus. & Com.Code § 26.01, not section 20(b) of RELA. We consistently have refused to erode section 20(b) with the same exceptions as may render oral contracts within the general statute of frauds enforceable. In *Landis v. W.H. Fuqua, Inc.*, 159 S.W.2d 228 (Tex.Civ.App.— Amarillo 1942, writ ref'd), the plaintiffs sued to recover a commission on an oral contract, asserting that they should recover the commission, despite the statute's writing requirement, on a theory of quantum meruit. We rejected the plaintiffs' contentions, concluding that to permit recovery of a commission on a theory of quantum meruit would in effect render the statute requiring a written commission agreement a nullity. *Landis,*

159 S.W.2d at 230–31. Quoting from other authority, we said:

> From its very nature a claim for commission cannot be made until earned. The sale is made, or the agent procures the purchaser ready and able to buy, and not until then does the right to the commission accrue. It accrues by virtue of a contract express or implied. But the statute says that no such contract shall be valid unless in writing. To hold that performance takes a claim of this character out of operation of the statute would, in our opinion, leave nothing for the statute to operate on.

*Id.* at 231 (citing *Weatherhead v. Cooney*, 32 Idaho 127, 180 P. 760, 761 (1919)).

We reached the same conclusion more recently in *Boyert v. Tauber*, 834 S.W.2d 60 (Tex.1992). There, a broker sued to recover a commission on a written agreement that did not identify the broker with the specificity section 20(b) requires. We held that the doctrine of partial performance would not render the agreement enforceable. *Id.* at 63–64. To hold otherwise would be in direct opposition to the expressed will of the Legislature and would unduly expose the public to fraudulent claims for commissions. *Id.* at 64.

Following *Boyert* and *Landis,* we decline to hold the doctrine of promissory estoppel is an exception to section 20(b) of RELA. Promissory estoppel generally is a defensive doctrine in that it estops a promisor from denying the enforceability of the promise. *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex.1965). It may apply when there is a promise that the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and does induce such action or forbearance, if injustice can be avoided only by enforcement of the promise. *"Moore" Burger*, 492 S.W.2d at 937 (citing Restatement (Second) of Contracts § 90 (1979)).

As a licensed real estate broker, Harkinson cannot act or forbear from acting in reliance on anything less than a signed written commission agreement. When a broker does so and relies on a promise to sign a written agreement that would satisfy section 20(b), the broker inevitably does so at his or

her own peril. Section 20(b) is clear and unequivocal, and the courts have been strict in adhering to its requirements. We continue that adherence today.

\* \* \* \* \* \*

The trial court properly rendered summary judgment that Harkinson take nothing. We reverse that part of the court of appeals' judgment reversing summary judgment on Harkinson's tortious interference and civil conspiracy claims and render judgment that Harkinson take nothing from the Crow defendants and Dan Patterson. We affirm the remainder of the court of appeals' judgment. As neither Hunt Products Company, Inc. nor Patterson/McLaine Group perfected an appeal in this Court, the court of appeals' judgment is final as to these parties.

GONZALEZ, J., filed an opinion concurring in part and dissenting in part, in which PHILLIPS, C.J., and ABBOTT, J., join.

GONZALEZ, Justice, joined by PHILLIPS, Chief Justice and ABBOTT, Justice, concurring and dissenting.

I concur in the Court's judgment to the extent that it bars Harkinson's claims against the owners of the property, Trammell Crow Company No. 60 and Petula Associates, Ltd., and Petula's parent company, Principal Mutual Life Insurance Company, and its manager Douglas Achtemeier ("owners"). However, as to the other defendants, the Court refuses to follow precedent, holds that a cause of action for interference with a written exclusive agency contract is barred by section 20(b), the statute of frauds provision of the Real Estate License Act ("RELA"), and for the first time in Texas jurisprudence, allows that provision to be asserted as a defense by persons who were not parties to a commission agreement with which they interfered. Because section 20(b) does not apply to such a situation, I would follow *Clements v. Withers*, 437 S.W.2d 818, 821 (Tex.1969), and *Warren v. White*, 143 Tex. 407, 185 S.W.2d 718, 719–20 (1945), and would enforce

the duties placed on real estate agents by article 6573a, section 15 of the Texas Real Estate License Act.

This is an appeal from a summary judgment. Thus, I will restate some pertinent facts, indulging every reasonable inference in favor of the non-movants and resolving any doubts in their favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 549 (Tex.1985). William Jeff Harkinson, a licensed real estate broker, entered into a signed, written exclusive agency agreement with Hunt Products ("Hunt") which provided that for one year, Harkinson would be Hunt's exclusive representative in its search for office/warehouse lease space. Harkinson negotiated this contract with Dan Patterson, an officer, director, and shareholder of Hunt, and John J. McLaine, Chairman and Chief Executive Officer of Hunt. Hunt agreed that it would refer all inquiries it received to Harkinson, and Harkinson agreed to look only to the prospective landlord/owner for his brokerage fee.

Harkinson located some property of which Trammell Crow Dallas Industrial ("Industrial") is the manager. Industrial was acting as an agent on behalf of the building owners, Trammell Crow Company No. 60 and Petula Associates. Harkinson began negotiations for lease space with Richard Strader, a lawyer/real estate agent employed by Industrial. Thomas Leiser was Strader's immediate supervisor throughout this process. During the negotiations, Harkinson gave Strader a copy of his exclusive agency agreement with Hunt. Harkinson and Strader orally agreed that Harkinson would be paid a 4½% up-front cash commission for locating a tenant for the property.[1] Strader then sent Harkinson a written commission agreement, which Harkinson did not sign. Instead, he revised it to reflect the terms of the oral agreement, signed the revised agreement, and returned it to Strader. Harkinson asked Strader several times when a copy of the signed commission agreement would be returned to him. Each time, Strader told Harkinson that the revised agreement was acceptable and that

---

1. Harkinson alleges that pursuant to an agreement with the owners, Industrial was to receive a 2¼% commission when an outside broker located

a tenant for the property, and a 4½% commission if Industrial procured a tenant without an outside broker.

Leiser would sign it and return it as soon as possible. Although he had not received a copy of the completed written agreement, Harkinson continued lease negotiations with the owners and agreed on a price of over $7,000,000.

After Patterson read the lease, he considered whether reducing Harkinson's commission would lower the price Hunt would have to pay to lease the premises. Instead of working with Harkinson, his exclusive agent, Patterson went behind Harkinson's back and contacted another broker, Jim Massey, who began secret negotiations on Patterson's behalf with Strader and Leiser to cut Harkinson's commission in order to lower Hunt's rental rate. After a conversation with Massey, Leiser told Strader to call Patterson directly to discuss this matter. Patterson asked Strader whether lowering Harkinson's commission would result in a lower rental rate for Hunt, and Strader told him it would. Patterson also asked Strader whether the owners had a signed commission agreement with Harkinson, and Strader told him they did not. Strader then told Patterson that he thought a $30,000 commission for Harkinson would be fair, and a second proposed lease agreement was drafted. This second proposal provided for a lower rental rate.

Harkinson was kept completely in the dark about the discussions that led to the second proposal. He eventually received the new proposal along with a letter from Strader stating that the reduced rental rate resulted from lower construction costs and "other savings." Harkinson later learned that the "other savings" included money saved by reducing his commission. When Harkinson asked about the reduction in his commission, McLaine advised Harkinson to accept the lower commission because Hunt was definitely going to lease the building. Leiser told Harkinson that his options with regards to the $30,000 commission were to "take it or leave it." Approximately a month later, Hunt signed a lease for the building, agreeing to pay $7,700,000 in rent over the term of the lease. Industrial, as agent for the owners, collected a 6% commission of $462,000. Strader personally received $103,950 as his part of this commission. Harkinson refused the $30,000 offer, and this lawsuit followed.

## I.

Harkinson's claims against Patterson are (1) tortious interference with the oral commission agreement between Harkinson and the owners, (2) tortious interference with Harkinson's prospective business relations with the owners, and (3) civil conspiracy to tortiously interfere. For two reasons, section 20(b) of RELA does not bar these claims: First, the actual wording of the statute, and second, the purpose behind it.

Section 20(b) reads:

> An action may not be brought in a court in this state for the recovery of a commission for the sale or purchase of real estate unless the promise or agreement on which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged or signed by a person lawfully authorized by him to sign it.

Tex.Rev.Civ. Stat. Ann. art. 6573a, § 20(b). By its explicit wording, this section applies to "[a]n action ... for the recovery of a commission" based on a "promise or agreement" against the "party to be charged" with that promise or agreement. *See Cohen v. McCutchin,* 565 S.W.2d 230, 232 (Tex.1978) (citing general statute of frauds, which provides that an agreement must be signed by the person to be charged with the promise or agreement). As the Court notes, the exclusive representation agreement between the prospective tenant Hunt and Harkinson expressly provides that Harkinson "will look solely to the landowner/owner for his fee." 944 S.W.2d at 632. No terms of the agreement charged Hunt, Patterson/McClaine, or Patterson with any obligation to pay the commission. Accordingly, the only parties that can properly be charged with that commission are Crow No. 60 and Petula, who owned the property. Therefore, by its own terms, section 20(b) applies to a suit for a commission against the party who promised or agreed to pay such commission, and who must have signed the commission agreement. It does not apply to a stranger to the agreement whose interference caused the broker

to suffer monetary damages. *See Clements v. Withers,* 437 S.W.2d 818, 821 (Tex.1969).

In *Clements,* just as in the case before us, the tortious interference suit was not brought against the party to be charged the commission, but against a third party who interfered with the plaintiff's right to that commission. *Id.* The majority attempts to distinguish *Clements* on the fact that in that case, there was a signed commission agreement that was deficient in its description of the property, while the deficiency in our case is that the written commission agreement was not signed by the owners. The Court declares there is a difference between the "technical deficiency" in the *Clements* writing and a total absence of any signed[2] 944 S.W.2d at 635. However, the Court gives no authority for this proposition. The Court has crafted the only authority by setting up separate, ad hoc categories under the heading of "unenforceable contracts," still allowing for a cause of action for interfering with one type of unenforceable contract in *Clements,* while disallowing a claim for tortious interference with another type of unenforceable contract in this case.

In *Clements,* we stated that the RELA statute of frauds "does not give third parties the right to interfere with the performance of oral contracts." *Id.* at 821 (emphasis added). Nevertheless, today's opinion states that the fact that there was at least some signed writing in *Clements* is a "critical factual distinction" from the present case. 944 S.W.2d at 635. If that is true, why did we in *Clements* state that third parties may not interfere with oral contracts? *Clements,* 437 S.W.2d at 821. If the Court is intimating that we meant to say "oral contracts evidenced by a signed writing," it should state as much and admit that it is overruling *Clements.*

In its further attempt to distinguish *Clements,* the Court refers to the "public policy" of section 20(b) as precluding an action for tortious interference with Harkinson's unen-

forceable contract with the owners. To support this statement, the Court curiously cites to the statute itself and to our decision in *Travel Masters, Inc. v. Star Tours, Inc.,* 827 S.W.2d 830, 833 (Tex.1991). However, in *Travel Masters,* we held that the covenant not to compete in that case was an unreasonable restraint of trade and unenforceable as against public policy. As a result, this covenant could not form the basis of a tortious interference claim. *Id. Travel Masters* does not provide authority for the proposition that because the agreement between Harkinson and the owners is unenforceable, it is also against public policy. If that broad statement were true, *Travel Masters* would have overruled *Clements,* in which we stated that even though the contract was unenforceable, there was not "any public policy opposing its performance." *Clements,* 437 S.W.2d at 821; *see Hutchings v. Slemons,* 141 Tex. 448, 174 S.W.2d 487, 489–90 (1943) (interpreting RELA's statute of frauds and stating that it does not render void or illegal a promise or contract within its terms, but merely establishes a rule of evidence).

Nor does section 20(b) itself indicate that an agreement unenforceable under the statute is also against public policy. The predecessor to section 20(b), which was virtually identical to the current version, rendered the commission agreement in *Clements* unenforceable. Act of June 1, 1955, 54th Leg., R.S., ch. 383, § 1, 1955 Tex. Gen. Laws 986, 1001 (repealed) (current version at Tex.Rev. Civ. Stat. Ann. art. 6573a, § 20(b)). Why then, was a claim for tortious interference with that agreement still allowed? The statute states that the promise or agreement must be "in writing" and must be "signed." In *Clements,* it was the "writing" prong of the statute that was not satisfied because the description of the land to be sold was not sufficient. *Clements,* 437 S.W.2d at 820. In the present case, it is the "signed" prong of the statute that has not been satisfied. The concerns that rendered the *Clements*

---

2. I emphasize the word "signed" because there is not a total absence of any writing. Indeed, as previously discussed, a written commission agreement had been revised by Harkinson and Strader and exchanged between them, with Strader even telling Harkinson that the revised agreement was acceptable and would be signed by his supervisor Leiser and returned as soon as possible.

agreement unenforceable under the same statutory provision are no less sweeping or important than the concerns that render Harkinson's agreement unenforceable. The Court has simply chosen to create an arbitrary distinction while labeling its reason as one dictated by "public policy."

## II.

Besides its express wording, the fact that section 20(b) is RELA's statute of frauds provision is enough to indicate that it should not be used to bar claims against third parties to real estate commission agreements. Section 20(b) is to be interpreted consistently with the general statute of frauds provision found in the Business and Commerce Code. *Boyert v. Tauber,* 834 S.W.2d 60, 63 n. 2 (Tex.1992) (citing TEX. BUS. & COM.CODE § 26.01). The general rule of law in this state for more than 100 years is that a statute of frauds defense is personal to the parties to a contract. *See Gulf, C. & S.F. Ry. Co. v. Settegast,* 79 Tex. 256, 15 S.W. 228, 229 (1891); *see also "Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 938–39 (Tex.1972); *Sasser v. Dantex Oil & Gas, Inc.,* 906 S.W.2d 599, 605 (Tex.App.—San Antonio 1995, no writ); *General Bonding & Cas. Ins. Co. v. McCurdy,* 183 S.W. 796, 800 (Tex.Civ.App.—San Antonio 1916, writ ref'd); *Western Union Tel. Co. v. Taylor,* 167 S.W. 289, 290 (Tex.Civ.App.—Austin 1914, writ ref'd); *McManus v. Matthews,* 55 S.W. 589, 590 (Tex.Civ.App.1900, writ ref'd); *Bell v. Beazley,* 18 Tex.Civ.App. 639, 45 S.W. 401, 403 (1898, no writ). Here, the Court disregards the general rule and allows a third party to invoke the defense. Numerous cases have held that a plaintiff may maintain a tortious interference suit against a third party even if the contract is unenforceable under section 20(b), because RELA's statute of frauds simply may not be invoked as a defense by a third party. *See Davis v. Freeman,* 347 S.W.2d 650, 654–55 (Tex.Civ. App.—Dallas 1961, no writ); *Wyche v. Noah,* 288 S.W.2d 866, 867–68 (Tex.Civ.App.—Dallas 1956, writ ref'd n.r.e.); *Yarber v. Iglehart,* 264 S.W.2d 474, 476 (Tex.Civ.App.—Dallas 1953, no writ). Today, despite more than a century of jurisprudence to support those decisions, the Court effectively overrules

them, enabling tenants such as Hunt to interfere with commission agreements between parties if there are personal financial rewards to be reaped by doing so.

Furthermore, today's holding is not in line with the purpose of section 20(b) as we identified it in *Warren v. White,* 143 Tex. 407, 185 S.W.2d 718 (1945). In that case, real estate broker T.C. Warren had a written agreement to be paid a commission by Mrs. Claude Kelly if he sold Mrs. Kelly's ranch. Another broker, A.J. White had a prospective purchaser for a ranch. He and Warren orally agreed that in consideration for Warren's furnishing White with the necessary information about the ranch for sale, White would sell the ranch to his customer and they could divide the commission between them. *Id.* When White did not honor the agreement, Warren sued for his share of the commission. After examining other states' similar real estate statutes of frauds provisions, we held that the purpose of the RELA statute of frauds was to protect the property owner from the imposition of false claims by real estate brokers. *Id.* 185 S.W.2d at 719. It did not apply to an agreement between brokers to share benefits, we reasoned, because this was not one between the owner and broker for the payment of a commission for the sale of land. *Id.* at 720.

Similarly, the suit by Harkinson against Patterson is not to enforce an agreement between a broker and a landowner. It is to recover for a third party's interference with such an agreement, and thus does not fall within the purposes of section 20(b). In fact, the damages for which Harkinson sued are even farther removed from the recovery of a real estate commission than those claimed by the plaintiff in *Warren.* In *Warren,* there is no disputing that the suit was for a portion of the actual fee that was paid by the owner of the property. *Id.* at 718. Still, the RELA statute of frauds did not apply because it was intended to regulate the relationship between property owners and brokers. *See id.* at 719; *Brice v. Eastin,* 691 S.W.2d 54, 57 (Tex. App.—San Antonio 1985, no writ) (stating that the RELA statute of frauds was designed to protect the landowner from the

imposition of false claims by real estate brokers).

## III.

The claims with regard to Industrial, Strader, and Leiser, are (1) tortious interference with Harkinson's exclusive representation agreement with Hunt, and (2) civil conspiracy to tortiously interfere. These are not claims for interference with Harkinson's commission agreement with the owners, but rather for interference with his opportunity and right to exclusively represent Hunt. Again, section 20(b) is a statute of frauds provision that governs commission agreements between real estate brokers and property owners. Therefore, it should not be invoked as a defense to interfering with a completely separate exclusive agency agreement.

I fully understand that a commission cannot be recovered against the party to a commission agreement unless a signed writing evidences the agreement. However, that requirement does not apply to Industrial, Strader, and Leiser. They were not the owners of the property. In their capacities as real estate agents for the owners, they were not the parties to be charged with the commission. Instead, they were agents who gained financial rewards by interfering with Harkinson's rights under his exclusive agency agreement with Hunt. Still, the Court insists on allowing a statute of frauds provision to act as a defense to this egregious conduct. I will not join such a radical departure from our state's statute of frauds jurisprudence.

Furthermore, the Legislature has declared that this alleged conduct is unethical and unlawful. Section 15 of article 6573a in part provides as follows:

Sec. 15. (a) ... The commission may suspend or revoke a license issued under the provisions of this Act at any time when it has been determined that:

... (6) the licensee, while performing an act constituting an act of a broker ... has been guilty of:

... (N) negotiating or attempting to negotiate the sale, exchange, lease, or rental of real property with an owner, lessor, buyer, or tenant, knowing that the owner, lessor, buyer, or tenant had a written outstanding contract, granting exclusive agency in connection with the transaction to another real estate broker;

... (V) conduct which constitutes dishonest dealings, bad faith, or untrustworthiness....

TEX.REV.CIV. STAT. ANN. art. 6573a, § 15.

Here, Harkinson had a written, signed exclusive agency agreement with Hunt and Patterson/McLaine. This vested in him rights which only he could exercise and obligated Industrial, Strader, and Leiser not to interfere with Harkinson's right to make a reasonable fee. Under the above statute, real estate brokers are prohibited from negotiating with a tenant knowing that the tenant has "grant[ed] exclusive agency in connection with the transaction to another real estate broker." *Id.* § 15(a)(6)(N). That is precisely what Harkinson has alleged happened here. Strader and Leiser negotiated directly with Hunt and an outside broker, Jim Massey, to reduce Hunt's rental rate and Harkinson's commission, knowing that Harkinson was Hunt's exclusive agent. The penalty for such unethical conduct is the imposition of civil liability and/or the possible suspension or revocation of the interfering brokers' real estate licenses. Therefore, I do not understand the Court's decision to render a take-nothing judgment in favor of Industrial, Strader, and Leiser when there exist genuine issues of material fact as to whether these defendants committed the acts Harkinson alleges.

## IV.

The court states that it is sympathetic to Harkinson's claims. 944 S.W.2d at 635. Harkinson does not need or want our sympathy. He merely requests that we enforce his rights to have his contracts protected from interference by others, and that we take note of the serious allegations of unethical and illegal conduct on the part of the defendants. Regrettably, today's decision will cause consternation and confusion in the real estate industry. The validity of exclusive agency agreements of the type involved is now ques-

tionable. It could be argued that they are worthless.

For all of the above reasons, in my opinion, there exist issues of material fact that preclude a summary judgment. Thus, I would affirm the judgment of the court of appeals to the extent it allows tortious interference and civil conspiracy causes of action against parties not charged with the commission agreement between Harkinson and the owners. I would remand this cause to the trial court for a trial on the merits.