Joe G. PERL, Appellant,

v.

Thomas L. PATRIZI, et al., Appellees.

No. 06–99–00076–CV.

Court of Appeals of Texas,
Texarkana.

Argued Feb. 8, 2000.

Decided March 22, 2000.

Opinion Overruling Rehearing
May 25, 2000.

Phil Dunlap, J. Mitchell Smith, Wells, Peyton, Greenberg & Hunt, LLP, Beaumont, for appellant.

William T. Johnson, William E. Townsley, Dale K. Hanks, Beaumont, for appellees.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

OPINION

Opinion by Justice ROSS.

Joe G. Perl contends that Patrizi's Restaurants, Inc. breached a contract with him that entitled him to realtor's fees or a commission on the lease or sale of property. At the end of Perl's evidence, the trial court rendered a directed verdict in favor of Patrizi's Restaurants and dismissed Patrizi's counterclaims. Both parties appeal.[1]

Perl first contends that the court erred by granting the directed verdict because the commission agreement, despite the absence of a termination date, was lawful and enforceable. Based on a favorable outcome of that determination, Perl further contends that the court should not have granted a directed verdict because he introduced evidence of breach of contract (the commission agreement), and because there was some evidence that all defen-

dants were liable even though some defendants did not sign the contract.

Patrizi (the prevailing party below) contends that the court should not have dismissed his counterclaims before he had a chance to introduce evidence on them because his claims were not negated by his victory over Perl's lawsuit (i.e., he had independent claims for relief), and because his claims were proven as a matter of law by evidence introduced by Perl in his case in chief.

BACKGROUND

Joe Perl is a realtor who hand wrote an agreement giving him six percent of income/lease payments if Patrizi's Restaurant sold or was leased to Post Oak Grill L.L.C., which operated a restaurant in Houston. Tommy Patrizi signed this agreement on behalf of the corporation. The corporation became insolvent, and lienholders on the property obtained a deed in lieu of foreclosure. Those lienholders (family members of Patrizi-not shareholders in the corporation) later leased the property to a newly created legal entity: Post Oak Grill L.L.C.-Beaumont. The lienholders refused to pay Perl. Perl sued Patrizi, the corporation, and the lienholders for breach of the agreement, and Patrizi, et al. countersued Perl for violation of the Deceptive Trade Practices Act, fraud, breach of fiduciary duty, and breach of contract.

A jury trial was held. When Perl rested, the court granted Patrizi a directed verdict on Perl's claims. The court then dismissed Patrizi's counterclaims.

The evidence shows that Perl is a retired real estate broker who resides in Beaumont. He made contact with Manfred Jachmich, a principal for Post Oak Grill. The company was seeking to expand its operations and was considering

---

1. Perl filed suit against Patrizi's Restaurants, Inc., Tommy Patrizi, individually and as president of the corporation, and other family members. All parties agree that Tommy Patrizi signed the contract as the president of the corporation, and all claims are grounded on the contract. Thus, we will refer to the defendants generally as "Patrizi" unless otherwise indicated.

opening a restaurant in Beaumont. Perl knew that Patrizi was in some financial distress, and on August 15, 1996, Perl took Jachmich to Patrizi's Restaurant, where they met and discussed the possibility of Post Oak Grill either purchasing or leasing the facility. After Jachmich left, Perl wrote, on stationery provided by Patrizi, a document in which Patrizi agreed to pay Perl six percent of any proceeds if the property was sold or leased as a result of Perl's activities.

The restaurant had been a family-owned business for about thirty years. It was started by Tommy Patrizi's father, then was purchased by a corporation owned by an older brother, Dan Patrizi, who operated it for about ten years, and then in 1989 was purchased by the corporation owned by Tommy Patrizi.

Tommy Patrizi testified that he called Perl the next day and canceled their agreement, but told him that he would work out something if Perl produced Post Oak Grill as a buyer or lessee, and that Perl had later called him to see what would be required to lease or purchase the property.

In late 1996, Tommy Patrizi entered into early stage negotiations with Jachmich, which continued into January 1997, when Jachmich told Patrizi that his prices were too high. Patrizi then listed the restaurant for sale with a local real estate firm, J.M. Prewitt. Within a few months, the restaurant, which had been struggling financially, was in serious trouble, needed repairs that the company could not afford, and put itself on a cash basis with creditors. In March the restaurant announced its closing, effective June 27, 1997.

In April, William Townsley, a local attorney and the father-in-law of Tommy Patrizi, asked Tommy if he could initiate communications with Post Oak Grill. Townsley had a financial as well as a personal interest, having personally loaned the corporation $160,000.00 on September 1, 1994, secured by a mortgage on the restaurant, and having guaranteed a $187,000.00 loan to the restaurant by a lending institution. Jachmich informed Townsley that he was interested in managing an operation there, but only if local investors could be brought in to fund the deal. Townsley pursued the idea, as well as negotiations with a separate restaurant that had made an offer to purchase. Townsley made a proposal to Post Oak Grill to lease the restaurant for $12,000.00 per month, the amount necessary to cover the outstanding monthly debt service on the property. The proposal was not accepted.

In May and June 1997, a series of memorandums were sent to Jachmich from Townsley, under the names of both Townsley and Perl, in which it became clear that Post Oak Grill did not want the property, but would be interested in helping to create a new entity with local investors that might lease the restaurant property. Townsley provided a list of potential investors to Jachmich, and there is testimony that Perl assisted in creating the list.

By this time, the restaurant was unable to make its payments either to the older brother from whom Tommy had purchased the property or to the bank, the utility bills were unpaid, and taxes were substantially delinquent. Rather than face formal foreclosure or declare bankruptcy, Tommy entered into an agreement with his brother Dan and Townsley in which he transferred the deed to the property to them, two thirds to Dan and one third to Townsley, in satisfaction of debts secured by the property. The corporation owed Dan $712,000.00, and owed Townsley $160,-000.00, as well as an additional $130,000.00 owed to the bank, which sum Townsley had personally guaranteed. They also took over all outstanding debts, including the arrearages in payroll, property taxes, and sales taxes. The transfer occurred on the date that the restaurant closed its doors.

After that date, a series of meetings were held between a different partner with

the Post Oak Grill–Houston operation and a collection of potential investors from Beaumont. Eventually, these culminated in the creation of a new entity, Post Oak Grill–Beaumont, L.L.C., which entered an option agreement to lease the property on August 20, 1997. A lease was signed on October 7, the entity took possession to remodel, and the restaurant opened for business on December 10, 1997. The lease provides for rental payments of $9,000.00 per month (beginning at one half that amount for three months), and the entity obligated itself to spend approximately $400,000.00 to remodel the facilities.

## PERL'S APPEAL

Perl contends that he was entitled to recover under the handwritten contract signed by Tommy Patrizi. It is dated August 15, 1996, and reads as follows:

Mr. Joe G. Perl  Re: Patrizi's
2437 Ashley St.  2050 Interstate 10 South
Beaumont, Texas  Beaumont, Texas
       77707
Dear Joe-

Pursuant to our conversation, please be advised if you negotiate a sale and/or lease on the captioned property, I will pay you 6% commission on the monthly rental of the primary term of the lease and any extensions thereof.

If a sale of the captioned property is negotiated by you, I will pay you 6% of the sale price.

I am presently working on the above with Manfred Jachmich of Houston, Texas as the prospective tenant (lessee) and/or purchaser.

   Sincerely yours,

   Tommy Patrizi

We first determine whether the document constitutes an enforceable contract. Real estate brokers are state-licensed individuals, and are subject to an extensive series of statutory and regulatory controls. The Real Estate License Act (TEX.REV.CIV. STAT. ANN. art. 6573a (Vernon Supp.2000)) requires that a person be licensed in order to engage in the business of real estate. The Act then proceeds to set out in detail

the way in which the realtor is to conduct his business. Section 20(b) of the Act explicitly provides that a person may not bring an action in this state for a commission for the sale or purchase of real estate unless the promise or agreement is in writing and signed by the party to be charged. We do not infer from this provision, however, that a contract becomes enforceable so long as those two requirements are met.

Further, Section 20(b) is only a foretaste of the regulations controlling the actions of a realtor. There is also a statutory requirement set out in Section 15(a)(6)(G), providing that the commission may suspend or revoke a realtor's license when it has been determined that the licensee, while performing an act as a broker, has been guilty of

> failing to specify a definite termination date that is not subject to prior notice in a contract, other than a contract to perform property management services, in which the licensee agrees to perform services for which a license is required under this Act.

■ The Texas Administrative Code also contains a substantial collection of rules delineating the way in which a realtor may conduct his business. At trial, counsel focused on a particular portion of that code as controlling. The Code provides that:

> Every listing contract or other contract in which the licensee agrees to perform services for which a license is required *must have a definite termination date*, upon which date the listing or other contract will automatically expire without any requirement of notice to the real estate licensee.

22 TEX. ADMIN. CODE § 535.148 (1999) (emphasis added). There is no question that the document does not contain a termination date. Thus, it does not meet the requirements of the rule. The question is whether this omission necessarily has the effect of voiding the contract. No Texas court has discussed this particular aspect of a realtor's fee agreement.

Perl contends that the rule and the underlying statute should not be read to provide any substantive requirements for contractual interpretation, because they are solely intended to provide requirements that must be met by a licensed realtor to avoid suspension or revocation of his license. He did not support this contention by applicable authority, and neither the rule nor the statute is internally restricted to this arena. The language used by the rule does not lend itself to that interpretation. It is clearly intended to set out specific requirements for contracts used by licensed realtors.

In applying other statutes within the scope of the Act, this Court (and others) have held that strict compliance with the terms of the Act is required if a broker is to use the courts to recover his commissions. *Henry S. Miller Co. v. Treo Enterps.*, 573 S.W.2d 553, 555 (Tex.Civ.App.-Texarkana 1978), *aff'd*, 585 S.W.2d 674 (Tex.1979). Most recently, the Texas Supreme Court held that a realtor may not seek to recover based on estoppel when the written document does not meet the requirements of the Act, and reiterated its previous position that quantum meruit was not available because of the intention of the Legislature in providing an extensive statutory regimen controlling this type of agreement. *Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 636 (Tex. 1997). Similarly, the court has held for the same reasons that if a written agreement does not identify the broker with the specificity required by the Act, the doctrine of partial performance would not render the agreement enforceable. *Boyert v. Tauber*, 834 S.W.2d 60 (Tex.1992).

■ These cases reflect that the requirements of a contract as set out by the Act are not merely requirements that must be met to retain a realtor's license, but are also substantive directives that must be followed in analyzing the contracts entered by licensed realtors. Accordingly, we conclude that we must apply the rule and statute as set out by the Legislature in our analysis of the contract at bar.

■ Rules set out by an administrative agency at the direction of the Legislature have the same force and effect of legislation, and are therefore construed like statutes. *Lewis v. Jacksonville Bldg. and Loan Ass'n*, 540 S.W.2d 307, 310 (Tex. 1976).

Thus, it is appropriate to apply the analytical framework supplied by the Legislature in TEX. GOV'T CODE ANN. § 311.016 (Vernon 1998), which states:

> The following constructions apply unless the context in which the word or phrase appears necessarily requires a different construction or unless a different construction is expressly provided by the statute:
>
> (1) "May" creates discretionary authority or grants permission or a power.
>
> (2) "Shall" imposes a duty.
>
> *(3) "Must" creates or recognizes a condition precedent.*

(Emphasis added.)

■ The word "must" in the quoted rule explicitly applies to the creation of a contractual agreement. Thus, by applying the Legislature's stated definition of the term to this agreement, the failure to provide a termination date is a failure to meet a condition precedent. A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation. *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex.1992); *Hohenberg Bros. Co. v. George E. Gibbons and Co.*, 537 S.W.2d 1, 3 (Tex.1976). Accordingly, because of the lack of this required element, the contract is, by statutory fiat, unenforceable. On this basis, the trial court properly granted a directed verdict in favor of Patrizi.

## PATRIZI'S COUNTERCLAIMS

■ Patrizi contends that the trial court erred by failing to render a verdict in his favor on his counterclaims. At the end of

the plaintiff's case, Patrizi sought and obtained a directed verdict on all claims brought against him by Perl. In the discussion about that motion, a number of matters were raised and addressed by counsel, but no mention was made of the counterclaims. At the end of the discussion, the court said that he was going to grant the directed verdict, and that he was going to bring the jury back in and let them know. The court then spoke to the jury as follows:

> Now, members of the jury, the Court has granted a directed verdict in favor of the defendants. What that basically means is that the plaintiff, in the Court's opinion, was not able to prove his case by a preponderance of the evidence. So that means the case is over. We appreciate your serving the days that you served and the attention you gave to this particular case.
>
> Sometimes this happens and it's one of those situations where the Court had to look at it from a legal standpoint based on the Court's knowledge of the law, and I made that decision based on that.
>
> And so, you won't have to come back tomorrow and you don't have to come back again until you receive another summons for jury service. When I release you, you will have an opportunity to talk to the lawyers and ask them some questions about the case, or you might not want to talk to them about it. And you will also have an opportunity to talk to the Court if you have some questions that you want to ask the Court about.
>
> But that effectively takes care of the case. It's one of those things that happens from time to time in the courthouse, and it happened this time. So, I'm going to release you, and, as usual, when I do release you please leave your badges on the rail.
>
> You're free to go at this time unless you have some questions.

Patrizi has waived any argument that the trial court erred by terminating the trial without permitting him to put on evidence in connection with his counterclaims, because he made no effort to present that evidence to the jury. *See* Tex.R.App. P. 33.1(a). We do not find that the trial court erred in terminating the case when it was never made aware that Patrizi had any desire to proceed with his counterclaims. Further, the judgment explicitly states that the counterclaims were without merit and unenforceable as a matter of law. No motion for new trial was filed.

Patrizi also contends that the court erred in rendering a take-nothing judgment against his counterclaims because the plaintiff provided conclusive proof of his contentions in his own evidence. Patrizi, however, never sought judgment on that basis.

The initial question is whether, by action or inaction, Patrizi has waived any right to recover under his counterclaims. In the very few cases where a party appears for trial but chooses not to pursue his action by presenting evidence, the courts hold that the action of the party after announcing ready for trial "in declining to offer any testimony in support of [the party's] motion or petition must be construed as an abandonment of the same as effectively as if it had been withdrawn and the case been dismissed, . . . ." *Sorrell v. Stone*, 60 Tex. Civ.App. 51, 127 S.W. 300, 301 (1910, writ ref'd).[2] By failing to offer any testimony in support of his counterclaims, Patrizi abandoned his claims as if they had been withdrawn.

**2.** *See generally Continental Sav. Ass'n v. Maheney,* 641 S.W.2d 290, 292 (Tex.App.-Houston [14th Dist.] 1982, writ ref'd n.r.e.); *Thompson v. Kirkland,* 422 S.W.2d 258, 260 (Tex.Civ.App.-Texarkana 1967, no writ), *citing Crane v. Pierce,* 257 S.W.2d 510 (Tex.Civ.App.-Dallas 1953, writ ref'd); *Turner v. Jackson,* 256 S.W.2d 127 (Tex.Civ.App.-Eastland 1953, writ ref'd); *Scheetz v. Bader,* 251 S.W.2d 427 (Tex.Civ.App.-Galveston 1952, no writ); *Cannon v. Willis,* 130 S.W.2d 920 (Tex.Civ.App.-Beaumont 1939, writ ref'd).

Patrizi sought and argued at length that he was entitled to a directed verdict. He received the relief he sought. By receiving this relief, however, and not either seeking a severance of his counterclaims or asking the court to retain the jury so that he could pursue those claims, he abandoned his counterclaims. We therefore hold that by failing to attempt to pursue his counterclaims at the time, he has now waived such right.

The judgment of the trial court is affirmed.

Dissenting opinion by Justice GRANT.

BEN Z. GRANT, Justice, dissenting.

The majority opinion reflects erroneous statutory construction, and fallacious reasoning, and makes bad precedent.

The majority finds that the failure to have a definite termination date in the listing contract voids the contract. Under common law precedents, the courts may also imply what a reasonable time for performance will be. *Berne v. Keith*, 361 S.W.2d 592 (Tex.Civ.App.-Houston [1st Dist.] 1962, writ ref'd n.r.e.). The majority has based the voiding of the contract on provisions contained in TEX.REV.CIV. STAT. ANN. art. 6573a, § 15(a)(6)(G) (Vernon Supp.2000), and 22 TEX. ADMIN. CODE § 535.148 (1999). Both of these provisions require that a definite termination date be included in the listing contract. The source of the Texas Real Estate Commission rule is the statutory rule.

Section 15 of Article 6573a, entitled "The Real Estate License Act," provides a long list of violations for which real estate brokers or real estate sales people may have their license suspended or revoked. TEX.REV.CIV. STAT. ANN. art. 6573a, § 15 (Vernon Supp.2000). This is the section in which the provision appears requiring a definite termination date. There is nothing in this section that in any way voids the document. Furthermore, the Commission has a choice of whether to suspend or revoke the license of the person involved,

or the Commission can reprimand or place the violating party on probation.

In Section 15(a)(9)(b), the law provides that, "[t]he provisions of this section [referring to Section 15] do not relieve a person from civil liability or from criminal prosecution under this Act or under the laws of this state." TEX.REV.CIV. STAT. ANN. art. 6573a, § 15(a)(9)(b). Beyond that, nothing is said about the civil liability for violations of the Act. Thus, a violation of Section 15 does not automatically void a listing contract, but rather subjects the real estate broker or salesperson to sanctions involving his or her real estate license. Nothing in this section indicates otherwise, and no precedent decided by any court indicates otherwise.

The majority opinion seems to rely heavily on Section 535.148 of the Texas Administrative Code. This section covers the provisions of the Real Estate License Act. It is contained in subchapter (n), which is entitled "Suspensions and Revocations of Licensure." Nothing in this section suggests that it would void a contract; however, just as the Act itself, it subjects a realtor to possible suspension or revocation of license. This provision does not purport to negate all real estate contract listings if the ending date is not contained in the contract. To so find infers from this Act something it does not imply.

To justify applying this statute in such a manner, the majority opinion cites *Henry S. Miller Co. v. Treo Enters.*, 573 S.W.2d 553, 555 (Tex.Civ.App.-Texarkana 1978), *aff'd*, 585 S.W.2d 674 (Tex.1979). This case deals with the application of Section 20(a), which in no way involves Section 15, which is applicable to the present case. TEX.REV.CIV. STAT. ANN. art. 6573a, § 20(a) (Vernon Supp.2000). Section 20(a) provides that

A person may not bring or maintain an action for the collection of compensation for the performance in this state of an act set forth in *Section 2* of this Act without alleging and proving that the

person performing the brokerage services was a duly licensed real estate broker or salesperson at the time the alleged services were commenced, or was a duly licensed attorney at law in this state or in any other state.

TEX.REV.CIV. STAT. ANN. art. 6573a, § 20(a) (Emphasis added.). Section 2 deals with the definition of who is a real estate broker or real estate salesperson. TEX.REV.CIV. STAT. ANN. art. 6573a, § 2 (Vernon Supp. 2000). Thus, this is a totally separate part of the Real Estate Act and does not touch top-side-or-bottom the applicable provision in this case.

The majority opinion also relies on the case of *Boyert v. Tauber*, 834 S.W.2d 60 (Tex.1992). That case involves Article 6573a, § 20(b). TEX.REV.CIV. STAT. ANN. art. 6573a, § 20(b) (Vernon Supp.2000). That case involved failure to fulfill the statutory writing requirement for a listing agreement. The law states specifically that

An action may not be brought in a court in this state for the recovery of a commission for the sale or purchase of real estate unless the promise or agreement on which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged or signed by a person lawfully authorized by the party to sign it.

TEX.REV.CIV. STAT. ANN. art. 6573a, § 20(b). Again, this case is not precedent for the case involving Section 15 of the Act, and the prohibition against bringing suit for Section 20(b) specifically spells out the writing requirement and does not include any violation existing in the present case. It is not proper precedent.

The majority also relies on *Trammel Crow Co. v. Harkinson*, 944 S.W.2d 631, 636 (Tex.1997). Again, that case involved the absence of a written agreement under Section 20(b). Thus, it is not an appropriate precedent for the present case.

This leaves the majority without any case precedent or law to support its newly established law that a violation of Section 15, by not having a specific termination date in the contract, would void the contract. There is no statutory fiat to make it unenforceable, but only a statutory provision to give authority to the board to suspend or revoke the license of a violating broker or real estate salesperson.

No directed verdict should have been granted on that basis. Therefore, I respectfully dissent.

## OPINION ON REHEARING

Joe G. Perl has filed a motion for rehearing in which he contends that both the majority and dissenting opinions are in error in concluding that the agreement in question is one covered by Section 15(a)(6)(G) of the Real Estate License Act.[3] Perl now argues that, because the agreement is not one in which he agreed to perform services, it is not a contract covered by this provision of the Act.

■ Thomas L. Patrizi, et al., correctly point out in their response that Perl has provided no authority for his current position. Further, Perl's position in his motion for rehearing differs substantially from that taken in the lawsuit. His position in the lawsuit is summarized by a statement contained in his initial brief before this Court: "Mr. Perl proved that he had a valid written agreement ... that he performed brokerage services pursuant to the commission agreement and was the procuring cause of a consummated lease..."

■ A party may not take a position on appeal that is inconsistent with its position in the trial court. *See Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 321–22 (Tex. 1984); *Nebgen v. Minnesota Mining & Mfg. Co.*, 898 S.W.2d 363, 366–67 (Tex.App.-San Antonio 1995, writ denied); *Stewart & Stevenson Servs., Inc. v. Enserve, Inc.*, 719 S.W.2d 337 (Tex.App.-

---

3. TEX. REV. CIV. STAT. ANN. 6573a, § 15(a)(6)(G)    (Vernon Supp. 2000).

Houston [14th Dist.] 1986, writ ref'd n.r.e.). The motion for rehearing is overruled.