NUMBER 13-07-00703-CV 


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


ROBERT PUCKETT, JAMES JULIUS 

PUCKETT, JR., INDIVIDUALLY AND D/B/A 

PUCKETT RANCH PROPERTIES, MERRILL

JOHN STOKES, A/K/A BUTCH STOKES, AND 

CBM COMFORT, INC., D/B/A RANCHBUYERS 

REAL ESTATE, A/K/A RANCHBUYERS.COM, Appellants,


v.



QUINT BURRIS, INDIVIDUALLY 

AND D/B/A QB PROPERTIES, Appellee.

 


On appeal from the 377th District Court

 of Victoria County, Texas.

 


MEMORANDUM OPINION


Before Justices Yañez, Garza, and Vela

Memorandum Opinion by Justice Yañez


Appellants, Robert Puckett, James Julius Puckett, Jr., individually and d/b/a Puckett Ranch
Properties, Merrill John Stokes, a/k/a Butch Stokes, and CBM Comfort, Inc., d/b/a
Ranchbuyers Real Estate a/k/a Ranchbuyers.com ("Ranchbuyers"), challenge the trial
court's judgment in favor of appellees, Quint Burris, individually and d/b/a QB Properties. (1) 
We affirm.

I. Background

 Larkin Thedford, an attorney, and the Hartnett Law Firm ("the Firm") represented
the Velma Lee and John Harvey Robinson Charitable Foundation ("the Foundation") in a
will contest. In that proceeding, the Foundation was awarded ownership of property known
as the "Robinson Ranch," which included nineteen acres of land in Jackson, Victoria, and
Hayes Counties, Texas. The Foundation assigned a percentage interest in the Robinson
Ranch to the Firm and Thedford for providing legal services. According to Thedford, the
owners, including the Firm and the Foundation, eventually agreed to sell the Robinson
Ranch. Thedford testified that after the owners discussed the sale of the Robinson Ranch,
it was understood that Dan Braman would be given the first opportunity to purchase the
property.

 Thedford then told his step-son-in-law, Burris, a real estate broker, to ask Robert,
Braman's real estate agent, if Braman was interested in buying the Robinson Ranch. (2) 
Burris contacted Robert and informed him that Braman would be given the first opportunity
to purchase the Robinson Ranch. Robert went to Burris's office and acquired appraisals
of the property, and at Burris's request, Robert signed a "Confidentiality Agreement." (3)

 The Robinson Ranch was eventually sold to SMZ Investments, L.P. ("SMZ") in
August 2006. Thedford later discovered that Burris was not listed as a broker receiving
payment of a commission for the sale. (4) SMZ immediately re-sold the property to "High
Country & Cattle" (the "second sale") for thirty-six million dollars; Stokes, Sara Friend a real
estate agent for Prudential Classic Realty, and Carlos Jackson Klutts divided a four percent
commission on that sale. (5) Stokes split his share of the commission with Robert. Burris
subsequently filed suit for breach of contract, fraud, and negligent misrepresentation
against the appellants, asking for fifty percent of the commission that appellants earned
on both sales. (6)

 After hearing the evidence, the jury answered eleven questions in the charge in
favor of Burris. (7) Burris filed an amended motion for judgment on the verdict and a request
for an additional finding, asking the trial court to: (1) make an additional express finding
that James was the sponsoring broker for Robert; and (2) render judgment on the theory
of fraud. The trial court ordered that Burris recover actual damages of $362,500 and
interest of $32,282. (8) Appellants, including James, were held jointly and severally liable. 
This appeal ensued.

II. The Evidence

A. Burris

 At trial, Burris, testified that he contacted Robert in October 2005, after Thedford
informed him that the Robinson Ranch was for sale. Robert told Burris that Braman was
"very interested in the ranch and wanted to know the purchase price." Robert informed
Burris that Braman was "ready to go" and that Robert "talked about how much money [the
two men] were going to make together as a team." Burris believed that Robert represented
Braman. After several months passed, Burris told Robert that the mineral rights were not
included in the sale of the Robinson Ranch, and according to Burris, Robert stated that
was not a "problem."

 In March 2006, Thedford instructed Burris to give Robert a copy of the appraisals
for Braman to review. On March 28, 2006, when Robert picked up a copy of the appraisals
and signed the "Confidentiality Agreement," Burris, while in Robert's presence, crossed out
"Puckett Ranch Properties" and wrote "Ranchbuyers.com" because Robert informed him
that he had "moved his license to Ranchbuyers.com." Burris wanted to protect his rights
to "[a]ny commissions [he] was going to get. . . .  Protect [himself] legally for giving [Robert]
that information to make sure that it wasn't going to any other people besides himself and
who he represented." After Robert signed the "Confidentiality Agreement," Burris provided
him with a copy of the appraisals. Upon Robert's request, Burris emailed a copy of the
appraisals to Stokes, whom Robert described as his "partner."

 Thedford, Burris, and Robert agreed to meet to discuss the sale of the property to
Braman. Robert told Burris that Stokes wanted to attend the meeting "because [Stokes]
does all the contracts and everything for Robert." When Thedford entered the meeting
room, he saw Stokes and "looked at him kind of concerned and wanted to know who this
fellow was. And Robert said, he's with me." When Thedford asked Stokes why he was
at the meeting, Stokes stated that he was there for Braman.

 Stokes indicated that he was "prepared" to give a $30 million offer to buy the
Robinson Ranch. Thedford stated, "[T]his is the deal. [Burris] is my son-in-law and Robert
we brought this deal together. . . .  I want to make sure you and [Burris] have everything
worked out, everything is good between y'all two. I want everything to go through [Burris]. 
This is [Burris's] deal. We're going through [Burris] to make this deal happen." Burris
stated, "Everybody shook their heads, said yes, sir, we're all in agreement." After hearing
the offer, Thedford asked if there was any commission, and Burris and Stokes said "[Yes,]
we want a 6 percent commission; 3 percent for QB Properties and 3 percent for
Ranchbuyers.com." Thedford stated that he would present the offer to the Firm and tried
calling Jim Hartnett, who was not available at the time. (9) The meeting ended.

 Thedford informed Burris that his name was not included in the contract that was
submitted. Burris called Robert, who stated that Robert's name was not on the contract
either, and that Robert did not know if he was going to get paid. Robert then told Burris
that "if [Robert] got anything he might give [Burris] 20 percent referral fee of whatever he
gets, and that's all [Burris] deserve[d]." Burris faxed Stokes a commission sharing
agreement, which Stokes refused to sign. Robert told Burris that Stokes "[was] not going
to pay [Burris] a dime."

 In August 2006, Thedford sent Burris a copy of the "U.S. Department of Housing
and Urban Development Settlement Statement" showing that the buyer paid one percent
commission to Klutts and Prudential Classic Realty and two percent commission to
Ranchbuyers Realty. According to Burris, the document he received did not include
information concerning who purchased the property.

 Burris stated that he had discussed the sale of the Robinson Ranch with two other
potential buyers, but that he had not disclosed the location of the property or the details
because Braman was given the first opportunity to purchase the property. Burris stated
that the Robinson Ranch had not been listed or advertised anywhere.

 Burris testified that he had an agreement to share a commission on the sale of the
Robinson Ranch with Robert "from the beginning" and that Robert never told Burris that
Robert could not share the commission with him. Burris stated, "[I]t was assumed between
both of us [Robert and Burris] that we were going to split the commission fifty-fifty." Burris
believed that he was entitled to half of the commission that Robert and Stokes received
because that was the agreement. According to Burris, had Robert informed him that he
would not share the commission with him, Burris would not have provided the appraisals
to Robert and would have stopped dealing with Robert. (10)

B. Robert Greer

 Greer, a real estate broker, testified that Burris had told him that some property was
for sale; however, Burris never revealed where the property was located. Greer worked
with Andy Murphy, a real estate broker from Florida. Murphy represented real estate
investors and told Greer that he had a buyer who was interested in purchasing a large tract
of land. Burris provided Greer with copies of the appraisals and Steve Kopp took pictures
of the property for the investor to review. Kopp informed Greer that the response from
Murphy was "favorable." Because a contract for sale of the Robinson Ranch had already
been written "Greer would show the property to Murphy's client or to other investors who
were interested if the contract "fell through." Greer told Murphy that the sale price was
thirty-six and one-half million dollars net to seller; Greer believed Murphy was "fine" with
that number. Once Greer discovered that the sale of the Robinson Ranch had closed,
there was no reason to continue.

C. Dan Hatfield

 Hatfield, a real estate broker, testified that he is an accredited land consultant who
specializes in farm and ranch real estate. (11) Hatfield explained that farm and ranch realty
is 


 kind of antiquated in the way we do a lot of our business. A lot of the
business that's done in residential is done electronically, very fast, very quick
based. You sell something this afternoon, close it in two days. . . .  Farm and
ranch is not that way. Farm and ranch is very traditional. . . .  A lot of the
listing agreements are not signed and they're not a signed listing agreement. 
In other words, somebody says, please sell my place, I'll pay you. It's done
on a handshake. It's done on an honor basis. A lot of the agreements
between brokers works [sic] the exact same way. One broker contacts the
other, says, will you help me sell this place, we'll split a commission without
ever having any formalized written agreement. . . .


According to Hatfield, in a real estate sale, the seller usually pays the commission;
however, the buyer in some instances will pay the commission. In either event, the seller's
and buyer's brokers will share the commission with each other.

 Hatfield identified plaintiff's Exhibit 8 as "the standard promulgated farm and ranch
contract form from the Real Estate Commission." Hatfield stated that page ten of the
contract was an addendum, which may include "sole and separate contracts and
agreements. . . . These [agreements] are between other people involved in the
transaction. [They c]an be between the different brokers involved as well as a receipt for
the escrow money with the escrow company, et cetera."

D. Klutts

 Klutts testified that Stokes told him that the Robinson Ranch was for sale and asked
if Klutts knew of a buyer. Klutts called Friend, who indicated that she had a client who was
interested in buying some ranch property. (12) Klutts called Stokes and stated, "this man
[Friend's client] is keenly interested. [Friend] talked to him. He wants to pursue doing a
contract on this place, and we need to proceed forward on it." Stokes told Klutts that
someone else had "first shot at this place" and that he needed to contact that person. A
couple of days later, Stokes informed Klutts that the "man [that had first shot] had decided
not to pursue the purchase of the Robinson Ranch." Klutts asked Friend to contact Stokes
to make a deal, and Klutts "step[ped] back" from the transaction.

 Friend orally agreed to split any commission that was made on the sale of the
Robinson Ranch with Klutts. After the contract selling the property to SMZ was signed,
Friend signed a commission sharing agreement with Klutts; Klutts had written the
agreement so that he could furnish it to the title company to ensure that he received his
payment. Klutts understood that he and Friend were "bringing the purchaser to the table"
while Stokes was "the one who knew about the property and told [them] about the property
and said he needed a buyer for that property."

E. Thedford

 Thedford testified that he had talked to Robert about the Robinson Ranch "through
the years," and Robert told Thedford that he wanted to work with him on the sale of the
property. The owners eventually agreed to sell the property, and Thedford was "given the
authority to submit to the broker or whoever [he] was working with the bottom line that we
would take and [Braman] had the option to take it or not take it." Thedford had Burris
contact Robert and they held a meeting at Thedford's office. However, Thedford did not
"commit the Foundation to pay a commission," and Thedford informed Burris that the
Foundation would not pay a commission.

 Robert told Thedford that "he worked with [Stokes] on various things and [Stokes]
had done some work for [Braman], so [Stokes] was going to help [Robert] present the sale
to [Braman]." Furthermore, neither Stokes nor Robert informed Thedford that Stokes was
not representing Braman, that Braman was not interested in purchasing the property, or
that there was another buyer presenting an offer. Thedford did not find out that Braman
had not purchased the property until after the "final contract had already been signed."

F. Kim Kubecka

 Kubecka, Burris's employee, testified that she assists Burris by typing documents
for him and that she typed the "Confidentiality Agreement" between Burris and Robert. 
Kubecka heard Robert tell Burris that Robert was not a broker and that his "license was
held by [Stokes] and Ranchbuyers.com." Kubecka thought that she would have to re-type
the document because Robert was now working for Ranchbuyers.com. She heard a
discussion wherein Robert told Burris to "scratch out" "Puckett Ranch Properties." 

G. Mike Crane

 Crane, Robert's friend and Burris's brother-in-law, testified that Robert told him that
he signed the "Confidentiality Agreement" and stated that he had the authority to sign for
the "ranch people, ranch properties."

H. Hartnett

 Hartnett testified that the sellers received multiple verbal offers and a few in writing
to purchase the property. They decided to sell it, and Thedford was 

 asked to let people know that the property was possibly for sale. And so that
would authorize him . . . to contact this [Burris] fellow or [Robert] or multiple
other people. . . .  At a later point in time, [Thedford] was authorized
specifically to convey an offer to the group that we thought was [Braman] of
the specifics of what the offer was, and that was 35 million, we would not pay
commission. . . .


 Hartnett did not discover that Braman was not the buyer of the property until after
the contract for sale was signed. According to Hartnett, if he had known that Braman was
not the buyer, he would not have dealt exclusively with SMZ. Hartnett stated, "I think I
would have definitely pitted people against each other to--to try and achieve a slightly
higher price. . . .  [W]e dealt with [Braman] slightly differently than we probably would have
dealt with just people coming in from the outside."

I. Stokes

 The trial court admitted Stokes's deposition testimony during Burris's case-in-chief. 
Stokes, a licensed real estate agent, testified that Robert informed him that the Robinson
Ranch was for sale and that the "seller group" wanted to sell it to Braman, but Braman had
"passed on the property because there were no minerals." Robert asked Stokes if his
"large buyer group" would be interested in purchasing the property. Braman gave Stokes
"permission" to work on the sale of the Robinson Ranch. Stokes stated that he met with
Thedford and Burris and someone asked him "point blank, they said, do you represent
[Braman]. And [Stokes] said, [Braman] is the reason that I'm here. And that's all I said."

 Stokes then stated that he told Thedford that he did not represent Braman, and that
Braman was not the "buying party." Later, counsel for Burris asked:

 Okay. Now there's--I want to make sure I understand this correctly because
in my mind there seems to be a pretty big difference between a couple of
your answers. I want to find out what you told [Thedford and Burris]. Did
you specifically tell [Thedford] in response to his question, [Braman] is the
reason I'm here or did you tell him no, I don't represent [Braman] but he's the
reason I'm here.


Stokes responded, "Okay, I specifically remember a question being asked of me if I
represented [Braman] and I said he's the reason I'm here. . . .  I specifically remember that. 
I do not remember the other."

 At trial, Stokes testified on his own behalf. Stokes stated that he only "represents
buyers" in the real estate transactions and that he has buyers that have "deep pockets." 
Stokes and Robert had met many years earlier, and they both dealt in ranch real estate. 
In early March 2006, Robert told Stokes that Thedford had informed him that the sellers
of the Robinson Ranch were ready to take offers. Stokes "went to work on it immediately"
by "[building] a book of facts in [his] mind" about the ranch. According to Stokes, he
probably had one hundred meetings and made "countless" phone calls to get prepared for
a presentation to a buyer. Stokes called Klutts, who told Stokes to contact Friend. Stokes
was not aware of Burris when he made a deal with Friend, who represented SMZ, to share
the commission they made on the sale. (13)

 Stokes informed SMZ that Braman had the first opportunity to purchase the property
and then acquired Braman's permission to attend the meeting with Thedford. Stokes
stated that he was a "surprise guest of Robert at [Thedford's] office." Robert told Stokes
that Burris would be at the meeting and had "been named as lead broker on the deal." 
Stokes testified that he informed Thedford and Burris that he did not represent Braman,
but did state that Braman was the reason he was there. However, Stokes was careful not
to reveal the identity of the buyer. The buyer authorized Stokes to make an offer of thirty
million dollars, which he did. Stokes insisted that he did not have a copy of the appraisals
before making the offer, and that when he finally received a copy, it was too blurry to read. 
Thedford informed Stokes that the sellers wanted thirty-five million dollars net to the
sellers--in other words, the sellers would not pay a commission on the sale of the property. 
On April 5, 2006, Thedford faxed a document to Hartnett and Stokes memorializing the
seller's terms. (14)

 Robert informed Stokes that he had signed a "Confidentiality Agreement" with
Burris, but Robert did not mention that Burris had "crossed out "Puckett Properties" and
put in Ranchbuyers." Robert did not have authority from Stokes or from the broker to enter
into an agreement with Burris on behalf of Ranchbuyers. (15)

 Stokes believed that he had an agreement with Burris that was limited to the first
offer presented at the meeting at Thedford's office. Stokes understood that the agreement
he had with Burris was that they would share a six percent commission only if it was paid
by the seller. Stokes believed that agreement "fell apart" when the seller refused to pay
any commission on the sale of the Robinson Ranch.

 When the seller refused to pay the commission, the buyer, SMZ, agreed to pay a
four percent commission to Stokes and Friend. In the "Farm and Ranch Agreement,"
Stokes was listed as the seller's real estate agent because it was the "only form [they] have
to hand somebody an offer," and Friend and Stokes "were the only two on this document
and there's a second space over here and so we just put our names in each one." Stokes
insisted that he was not representing the seller and that Friend was aware that he was not
representing the seller. According to Stokes, the document was merely for the purposes
of negotiating the deal.

 After SMZ bought the Robinson Ranch, the owner of SMZ, Stephen Ziechang,
wanted another real estate agent to sell the property. (16) However, Stokes spoke with
Ziechang and promised to pay for necessary expenses if Ziechang allowed him to handle
the sale. Ziechang agreed but gave Stokes only two weeks to find a buyer. Stokes did not
have the money to pay for the expenses; Robert eventually gave Stokes the money.

 On August 14, 2006, Stokes wired $649,500 to Robert. However, according to
Stokes, the amount did not include a share of the commission from the sale of the property
to SMZ. Instead, Stokes explained that: $50,000 of the payment was a referral fee to
Robert for bringing the deal to him; $360,000 was the commission that he paid Robert on
the second sale; $57,000 was reimbursement to Robert for expenses; $109,000 "[was] a
number on a sale that Robert held a six percent agreement on prior to coming to us and
that is in Live Oak County"; and the remaining amount, approximately $100,000, was
money that Robert had asked Stokes to "hold because sometimes he gets a little spendy
and he had some things coming up and [Robert] wanted [Stokes] to hold on to some
money for him."

 On cross-examination, Stokes stated that although documents accounting for the
money he wired to Robert did not exist, he had "found some supporting things" allowing
him to determine the reason for the wire transfer. (17) Stokes also stated that he did not have
any documents to show how the amounts wired to Robert had been calculated and that
he had based the calculations on his own recollection. Stokes admitted that in his answer
to an interrogatory asking if he had received money from any party during the past twelve
months, he did not indicate that he received either $57,000 or $100,000 from Robert. 
Furthermore, Stokes said that he did not take the lawsuit seriously until one month before
trial, when he "went back to the facts as hard as [he] could."

J. Robert

 Portions of Robert's deposition were played for the jury during Burris's case-in-chief. 
In it, Robert testified that in October 2005, Burris contacted him regarding the sale of the
Robinson Ranch. Burris told Robert "that [Burris] was going to be the listing agent of the
property and [Thedford] was going to give [Robert] a shot at selling the property to
[Braman]." At this time, Robert was "still operating under [Puckett Ranch Real Estate]." 
On April 19, 2006, he "moved his license to Ranchbuyers Realty Service."

 Robert told Burris and Thedford that Stokes "was helping him sell the property." 
Thedford and Burris were aware that Robert represented Braman. When asked if
Thedford believed that Stokes was also representing Braman, Robert stated that he did
not "know what [Thedford] was thinking."

 Robert "didn't really look at [the Confidentiality Agreement] before [he] signed it" and
he did not see the line stating that he agreed to protect Burris's interest. However, Robert
believed that Burris would share a commission paid by the seller if Robert found a buyer
through Stokes or anyone else.

 Robert did not receive a portion of the commission, but Stokes gave him a "finder's
fee" of $50,000 for the sale to SMZ. Robert received a commission on the second sale;
he did not recall the exact amount but thought it was "between half a million and
$700,000." Robert stated that he tried to hide the fact that Braman was not interested in
the property from Thedford and Burris; however, Robert then denied that he concealed that
from them. Robert then clarified that his answer was "Kind of yes and no." Robert could
not explain his answer. Robert did not remember whether he told Thedford or Burris that
Braman was no longer interested in purchasing the property.

 On direct examination, Robert testified that although Braman stated he was not
interested in the Robinson Ranch once he discovered the mineral rights would not be sold,
Braman still wanted to know the asking price. Robert said that he had sold other property
to Braman even after Braman had indicated he was not interested. However, on cross-examination, Robert conceded that Braman did not ask Robert to find out the sale price
of the property. Robert stated that a client may tell him "no" on numerous occasions, but
that he would still continue asking because he is a salesman.

 When Robert signed the "Confidentiality Agreement," Burris did not tell him to
provide the appraisals only to Braman. Robert's "understanding of the confidentiality
agreement was that [he] couldn't take the, whatever materials that he gave me to an
unqualified purchaser and your general whatever; that it would have to be a qualified
buyer." Robert testified that such a requirement is a "normal restriction" contained in a
confidentiality agreement. Robert informed Burris that he would be moving his license to
Ranchbuyers.com in the near future; in fact, within the next two or three weeks, Robert
became licensed "under Ranchbuyers.com." Robert asked Burris to send a copy of the
appraisals to Stokes. Robert showed Braman the appraisals, and Braman was not
interested in the property, but still wanted to know the asking price. Robert stated that he
did not know Braman would not purchase the property until Stokes made the thirty-million-dollar offer, which was "too rich" for Braman. Robert explained that the $649,500 wire
transfer from Stokes included Robert's commission for the second sale of $360,000 and
$57,000 in reimbursements. Stokes informed Robert that the balance of the amount was
for commission on the sale of property in other transactions. However, when Robert
testified, he could not provide an accurate accounting of the $649,500, and stated that
plaintiff's counsel should ask Stokes for that information.

III. Burris's Right to a Commission

 By his first issue, Stokes argues that Burris did not have a "right" to the commission
because "he did not represent any 'person' that would be paying a commission, rebate, or
fee." However, the issue at trial was merely whether Stokes and Robert agreed to share
any commission made on the sale of the Robinson Ranch with Burris, regardless of which
party paid it. Therefore, in order to sustain this issue, we must conclude that a broker or
agent may not agree to divide his or her commission with any broker or agent who does
not represent a party in the transaction. We decline to do so.

 Stokes provides no authority and we find none supporting a conclusion that Stokes
and Robert were barred from agreeing to share their commission with Burris because he
may not have had a client in the transaction. (18) Based on the record before us, we cannot
conclude that Stokes and Robert were prohibited from agreeing to share their commission
with Burris, even if Burris did not represent either the seller or the buyer in this transaction. 
Furthermore, we note that there was evidence presented at trial that it is customary for real
estate agents and brokers to agree to share their commission with others who did not
represent a party in the transaction. At trial, Klutts testified that Friend, the SMZ's
representative, agreed to share her commission with Klutts, even though he did not have
a client in the transaction. The evidence also supports a finding that Stokes himself did not
represent a client in the second sale of the property, but was still allowed to share in the
commission. In fact, Klutts testified that Stokes did not represent either the seller or the
buyer in the second sale, but Klutts and Friend still shared the commission from that sale
with Stokes. (19) Moreover, there is nothing in the record to indicate that Robert represented
either the seller or the buyer in the second transaction; nonetheless, Stokes testified that
he shared his commission from the second sale with Robert. We overrule Stokes's first
issue.

 Stokes, by his second issue, and Puckett by a sub-issue also argue that if Burris
violated the Real Estate License Act ("RELA"), he is precluded from collecting a
commission. Specifically, appellants allege Burris violated section 535.148 of title 22 of
the administrative code, and therefore any agreement to split a commission with Burris is
unenforceable. (20)

 In Henry S. Miller Co. v. Treo Enterprises, a case interpreting the statute of frauds
provision of RELA, which does not apply to an agreement between real estate agents and
brokers, the court of appeals concluded that "[s]trict compliance with the terms of [RELA] 
is required if a broker is to use the courts to recover his commissions." (21) The statute relied
on by that court specifically stated:

 A person may not bring or maintain an action for the collection of
compensation for the performance in this state of an act set forth in Section
2 of this Act without alleging and proving that the person performing the
brokerage services was a duly licensed real estate broker or salesman at the
time the alleged services were commenced, or was a duly licensed attorney
at law in this state or in any other state.[ (22)]


In Trammel Crow Co. No. 60 v. Harkinson, (23) the supreme court, citing former article 6573a,
section 20(b) (24) of the Texas Revised Civil Statutes, concluded that to be enforceable, a
commission agreement must be in writing and that section 20(b) precluded enforcement
of an oral contract to recover a commission. (25) Section 20(b), cited by the supreme court,
specifically stated:

 An action may not be brought in a court in this state for the recovery of a
commission for the sale or purchase of real estate unless the promise or
agreement on which the action is brought, or some memorandum thereof,
is in writing and signed by the party to be charged or signed by a person
lawfully authorized by him to sign it.[ (26)]


However, section 535.148 does not contain the language found in the statute relied on by
the supreme court in Trammel that specifically prohibited maintaining a cause of action if
the statute was not fully satisfied.

 Appellants, relying on Perl v. Patrizi, urge us to conclude that a broker's failure to
comply with section 535.148 of title 22 of the administrative code makes any agreement
with other brokers or agents to share a commission unenforceable. (27) We decline to do so. 
In Perl, the Texarkana Court of Appeals held that a contract was unenforceable because
it failed to comply with a former version of section 535.148 that provided that "[e]very listing
contract or other contract in which the licensee agrees to perform services for which a
license is required must have a definite termination date, upon which date the listing or
other contract will automatically expire without any requirement of notice to the real estate
licensee." (28) However, the Houston Court of Appeals in Northborough Corporate Limited
Partnership, L.L.P. v. Cushman & Wakefield of Texas, Inc., declined to follow the
Texarkana court's holding. (29) Instead, the Northborough court concluded that even had
there been a violation of a rule leading to the revocation or suspension of the broker's
license, the violation would not necessarily void a contract. (30) We agree with the court's
reasoning in Northborough.

 Section 535.148, part of a subchapter, entitled "Suspension and Revocation of
Licensure," allows the Texas Real Estate Commission to suspend or revoke a broker's
license if the broker or agent fails to disclose to his or her client an intention to receive a
commission from another party or fails to gain his client's consent to do so. (31) Specifically,
it states in part as follows:

 A licensee may not receive a commission, rebate, or fee in a transaction
from a person other than the person the licensee represents without first
disclosing to the licensee's client that the licensee intends to receive the
commission, rebate or fee, and obtaining the consent of the licensee's client. 
This subsection does not apply to referral fees paid by one licensed real
estate broker or salesperson to another licensed broker or salesperson.[ (32)]


Section 535.148, like the rule relied on by the Perl court, "has nothing to do with the
enforceability of a broker's commission agreement. Instead, it relates solely to the
suspension or revocation of a broker's real estate license." (33) Furthermore, nothing in
section 535.148 "references a broker's ability to maintain a cause of action." (34) The
supreme court noted in Trammel Crow that it could not ignore the legislature's "unequivocal
expression of intent set out in section 20(b) . . . [that] 'a broker may not recover a
commission unless the commission agreement is in writing and signed by the party to be
charged.'" (35) However, we do not find the same mandate in section 535.148.

 Moreover, the Perl court concluded that by including the word "must" in the former
version of section 535.148, the legislature intended that a contract have a termination date
as a condition precedent to its enforcement. (36) The provision considered by the Perl court
stated, "Every listing contract or other contract in which the licensee agrees to perform
services for which a license is required must have a definite termination date, upon which
date the listing or other contract will automatically expire without any requirement of notice
to the real estate licensee." (37) Here, the rule cited by appellants does not contain language
indicating that notifying a client of the intent to split or share a commission with another,
or gaining the client's consent to do so, is a condition precedent to enforcement of an
agreement between brokers or agents to share a commission. We cannot conclude that
a broker's or agent's failure to inform his client of his intent to share or split a commission
paid by one party with other brokers or agents or to obtain consent from his client to do so,
renders such a contract unenforceable. We overrule Stokes's second issue and Puckett's
sub-issue contending that an agreement to split or share the commissions was
unenforceable. (38)

IV. Sufficiency of the Evidence

 Puckett (39) and Stokes (40) challenge the legal and factual sufficiency of the evidence
supporting the jury's finding of fraud.

A. Standard of Review

 We may sustain a challenge to a jury finding based on legal sufficiency only when: 
(1) the record discloses a complete absence of evidence of a vital fact; (2) the court is
barred by rule of law or of evidence from giving weight to the only evidence offered to
prove a vital fact; (3) the evidence provided to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. (41) "[W]hen
the evidence offered to prove a vital fact is so weak as to do no more than create a mere
surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal
effect, is no evidence." (42) More than a scintilla of evidence exists if the evidence rises to
a level that would enable reasonable and fair-minded people to differ in their conclusions. (43)

 In our legal sufficiency review, we review the evidence in the light most favorable
to the finding, crediting favorable evidence if a reasonable fact-finder could and
disregarding contrary evidence unless a reasonable fact-finder could not. (44) The final test
for legal sufficiency is whether the evidence presented at trial would enable reasonable and
fair-minded people to make the finding under review. (45)

 When reviewing a jury finding for factual sufficiency, we consider and weigh all of
the evidence in a neutral light and conclude that the finding is not supported by sufficient
evidence only if the finding is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and unjust. (46) We must "detail the evidence relevant to the issue" and
"state in what regard the contrary evidence greatly outweighs the evidence in support of
the verdict." (47)

B. Discussion

 At trial, Burris alleged that Stokes and Robert represented to him that they would
share a commission with him on the sale of the Robinson Ranch but failed to do so. Burris
claimed that their failure to perform caused him damages--the loss of the commission. 
The jury agreed and found that Stokes and Robert had committed a fraud that caused
Burris's damages.

 To recover on a cause of action for fraud, a party must show: "(1) that a material
representation was made; (2) the representation was false; (3) when the representation
was made, the speaker knew it was false or made it recklessly without any knowledge of
the truth and as a positive assertion; (4) the speaker made the representation with the
intent that the other party should act upon it; (5) the party acted in reliance on the
representation; and (6) the party thereby suffered injury." (48)

 In the charge, the trial court instructed the jury that a misrepresentation means "[a]
promise of future performance made with an intent, at the time the promise was made, not
to perform as promised." (49) For a promise of future performance to be the basis of
actionable fraud, it must have been false at the time it was made. (50) "Failure to perform,
standing alone, is no evidence of the promisor's intent not to perform when the promise
was made. However, that fact is a circumstance to be considered with other facts to
establish intent." (51) The jury may infer intent from the party's subsequent acts after the
representation is made. (52) "'Slight circumstantial evidence' of fraud, when considered with
the breach of promise to perform, is sufficient to support a finding of fraudulent intent." (53)

 The jury found that Stokes and Robert agreed to split or share any commission
made on the sale of the Robinson Ranch with Burris. (54) Burris testified that he had an
agreement to share a commission on the sale of the Robinson Ranch with Robert "from
the beginning." He assumed that they would split the commission fifty-fifty. Robert
testified he believed that he and Burris would share a commission paid by the seller if
Robert found a buyer through Stokes or anyone else. Stokes believed that he had an
agreement with Burris to share a six percent commission only if it was paid by the seller. 
However, Stokes argues that the evidence is legally and factually insufficient to support a
finding that he agreed to share a commission with Burris regardless if it was paid by the
buyer or the seller. Stokes testified that he had an agreement to share a commission with
Burris, but he asserted that the agreement terminated when the sellers refused to pay it. 
Burris testified that he believed he had a verbal agreement with Stokes and Robert entitling
him to fifty percent of a commission on the sale of the property even if it was paid by the
buyer. The jury believed Burris. (55) It is undisputed that Stokes did not split the commission
with Burris.

 Burris presented evidence that Stokes and Robert continued to tell him that Braman
was the buyer even though Braman was no longer interested. Robert told Thedford that
Stokes was going to help Robert present the sale opportunity to Braman. According to
Thedford, neither Stokes nor Robert informed him that Stokes did not represent Braman,
Braman was not interested in purchasing the property, or SMZ was presenting an offer. 
Thedford did not find out that Braman did not purchase the property until after the "final
contract had already been signed." Thedford made it clear to Stokes and Robert that the
sellers wanted to give Braman the first opportunity to purchase the property. Burris stated
that he would have found another buyer if he had known that Braman was not interested. 
Hartnett testified that he would have dealt with SMZ differently had he known it was not
Braman making the offer to purchase the property. Hartnett stated that he would not have
entered an exclusive agreement to sell the property with SMZ had he known that Braman
was not making the offer, and he would have tried to "pit" other buyers against each other. 
From this evidence, the jury may have reasonably inferred that Stokes and Robert made
a material misrepresentation to Burris.

 Burris testified that once he believed that he had an agreement with Stokes and
Robert to split a commission, he provided confidential information--the appraisals of the
property--to them and did not pursue other buyers. Robert signed the confidentiality
agreement before Burris provided the appraisals to him and Stokes. When he signed the
agreement, Robert indicated that Stokes was his partner. Burris testified that he intended
to protect his rights to the commission in the confidentiality agreement. Robert stated that
he did not read the document before signing it. There is a clause in the confidentiality
agreement stating that Burris's rights were to be protected. Burris explained that his rights
included a right to share in the commission. Burris testified that he edited the
confidentiality agreement to show that Ranchbuyers.com held Robert's license upon
Robert's request. Robert told Thedford that Stokes "[did] all the contracts and everything
for [Robert]." Burris testified that he would not have provided the appraisals to Robert or
Stokes had he been aware that they did not intend to share the commission with him. 
Furthermore, if Burris had known that Stokes and Robert had not intended to share a
commission with him, he would have stopped dealing with Stokes and Robert.

 In Question 7, the jury was asked, "What sum of money, if any, if paid now in cash,
would fairly and reasonably compensate [Burris] for his damages, if any that were
proximately caused by such fraud?" The jury answered "$362,500." Proximate cause was
defined in the charge as "that cause which, in a natural and continuous sequence,
produces an event, and without which cause such event would not have occurred." The
jury was asked to "consider the following element of damages . . . and none other: The
sum of money, if any, that [Burris] would have received if the fraud had not taken place." 
The sum of money that Burris would have received if Stokes and Robert had not
committed the fraud was $362,500--half of the commission that Stokes received from SMZ
on the sale of the Robinson Ranch. (56)

 The jury agreed with Burris and found that Stokes and Robert committed fraud. 
Based on the evidence presented at trial, the jury could have reasonably believed that: (1)
there was an agreement to split a commission on the sale of the Robinson Ranch with
Burris; (2) in reliance upon that agreement, Burris acted and was instrumental in providing
information to Stokes and Robert that assisted them in selling the property to SMZ; (3) at
the time Stokes and Robert agreed to share a commission with Burris, they did not intend
to do so; (4) by their conduct and representations, Stokes and Robert concealed that intent
from Burris; and (5) by their failure to share the commission with Burris, he suffered injury
in the amount of $362,500.

 Viewing the evidence in the light favorable to the jury's finding, crediting favorable
evidence if a reasonable fact-finder could and disregarding contrary evidence unless a
reasonable fact-finder could not, we conclude that there is some evidence supporting each
element of the jury's finding of fraud. (57) Thus, we conclude that Burris presented legally
sufficient evidence that Stokes and Robert made representations with no intention of
performing as represented in order to induce Burris to continue providing confidential
information to them and to not pursue selling the property to another prospective
purchaser. (58) Furthermore, after considering and weighing all of the evidence in a neutral
light, we conclude that the finding is not so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust. (59) We overrule appellants' challenge to the
legal and factual sufficiency of the evidence supporting a finding of fraud. (60)

 Finally, by a sub-issue, appellants argue that Robert did not receive a commission
on the sale of the Robinson Ranch to SMZ. However, there was evidence that Robert
received a wire transfer of $649,500 and Robert stated during his deposition that he
received between half a million dollars and $700,000 from the sale of the Robinson Ranch. 
Neither Stokes nor Robert could account for the $700,000; if Robert was only entitled to
half of the commission on the second sale, he would have received $360,000. The jury
was free to disbelieve Stokes's testimony that he had, based on his own recollection and
without documentary evidence, somehow calculated the extra amount as including
expenses owed to Robert, the finder's fee of $55,000, commission from other sales, and
money Robert asked Stokes to hold for him. We overrule appellants' sub-issue.

V. Joint and Several Liability

 By their final issue, appellants contend that there is legally and factually insufficient
evidence to support the jury's finding that Robert and Stokes were "part of a conspiracy to
commit fraud." Based on this finding, the trial court held Stokes and Puckett jointly and
severally liable for Burris's damages.

 Puckett argues that the evidence was insufficient to support the following elements
of conspiracy: (1) that the combination of two persons was to commit an unlawful purpose
or a lawful purpose by unlawful means; (2) the members of the conspiracy had a meeting
of the minds on the object or course of action; (3) one of the members of the conspiracy
committed an unlawful, overt act to further the object or course of action; and (4) the
plaintiff suffered injury as a proximate result of the wrongful act. (61) However, the jury was
not instructed on these elements of conspiracy. Instead, the jury was instructed to find a
conspiracy if: (1) Stokes and Robert "had knowledge of, agreed to, and intended a
common objective or course of action that resulted in the damages to [Burris]"; and (2) a
member of the conspiracy "performed some act or acts to further the conspiracy." 

 "The sufficiency of the evidence must be measured by the jury charge when, as
here, there has been no objection to it." (62) Therefore, we must review the sufficiency of the
evidence in light of the instructions given to the jury. There was evidence that Stokes and
Robert agreed to split a commission with Burris but did not intend to perform as promised
when they made the agreement. Furthermore, evidence was presented that Stokes wired
almost $650,000 to Robert after the property was sold and re-sold; however, Stokes
claimed that Robert only received a $50,000 finder's fee. The jury did not believe Stokes
and must have believed that Robert received half of Stokes's commission on both sales
of the property. From this evidence and the evidence detailed above, the jury may have
reasonably inferred that Stokes and Robert had knowledge of, agreed to and intended the
common objective or course of action of committing the fraud against Burris that resulted
in the damages. (63) Furthermore, the jury may have reasonably found that Stokes, Robert,
or both performed some act or acts to further the conspiracy. (64) Therefore, after reviewing
the evidence in the light most favorable to the finding, crediting favorable evidence if a
reasonable fact-finder could and disregarding contrary evidence unless a reasonable
fact-finder could not, we conclude that there is legally sufficient evidence to support the
jury's finding of a conspiracy under the instructions provided. (65) Furthermore, after
considering and weighing all of the evidence in a neutral light, we conclude the finding is
not so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust. (66) Because the evidence is legally and factually sufficient to support the jury's
finding of a conspiracy, the trial court did not err in holding Stokes and Puckett jointly and
severally liable for Burris's damages. (67) We overrule appellants' final issue.

VI. Conclusion

 Having overruled appellants' challenge to the legal and factual sufficiency of the
evidence supporting a finding of fraud and conspiracy, we need not address appellants'
issues challenging the jury's findings of breach of contract and negligent
misrepresentation. (68) We affirm the trial court's judgment.

 

 _________________________

 LINDA REYNA YAÑEZ,

 Justice

Delivered and filed 

the 24th day of November, 2009.


1. Robert and James have submitted a single brief. We will refer to them collectively as "Puckett."
2. In their briefs, Puckett and Stokes emphasize that Thedford wanted to help Burris and his step-daughter make money.
3. The agreement states, in pertinent part:


 [Robert] and Puckett Ranch Properties . . . expressed a desire to investigate a
possible acquisition of the Robinson Ranch. . . . This Confidentiality Agreement will confirm
[Burris], QB Properties and [Robert], Puckett Ranch Properties mutual understanding and
agreement in connection with "Receipt of Information" regarding the real estate. [Robert] and
Puckett Ranch Properties hereby acknowledge that he has entered into this Confidentiality
Agreement.

 

 1. "Information" means all oral or written data, reports, records, or materials
and any other nonpublic information or data received by [Robert] and
Puckett Ranch Properties.

 

 2. Information is being furnished solely in connection with consideration of
the acquisition of real estate. No portions of this information shall be
disclosed to other[s] except to those persons or organizations whose
knowledge of the information is required to evaluate the potential acquisition
or as required by law or government authority and who shall assume the
same obligations under the Agreement. The undersigned hereby assumes
full responsibility for the compliance to the terms of this Agreement.

 

 3. It is understood that [Burris] and QB Properties' rights are being
protected.
4. On page ten of plaintiff's Exhibit 8, a "Farm and Ranch Contract," "Ranch Buyers Real Estate"
(Stokes's company) is designated as the "Listing or Principal Broker" representing only the seller. The
document further provides that Prudential Classic Realty is the "Other Broker" and represented only the buyer. 
It also provided that the buyer would pay the "Listing/Principal Broker" and the "Other Broker" each two
percent of the sales price. However, there is no explicit mention of Burris or Robert. Carlos Jackson Klutts,
a real estate broker, is also not mentioned in the document; nonetheless, Sara Friend, the agent working for
Prudential Classic Realty and Klutts, signed a commission sharing agreement after closing, which instructed
the title company to pay a commission of one percent of the sales price to Klutts.
5. Stokes notified Klutts, a real estate broker, that the Robinson Ranch was for sale. Klutts then
contacted Friend, a real estate agent with Prudential Classic Realty, who represented SMZ, the buyer in the
first sale.
6. Burris also sued Sue Seeliger, who is not a party to this appeal.
7. The jury found that: (1) Burris had an agreement with Robert and Stokes to share commissions from
the sale of the Robinson Ranch; (2) Burris "did not fail" to disclose to his client that he intended to receive a
commission from a person other than his client or failed to obtain the consent of his client to do so; (3) Robert
and Stokes failed to comply with the agreement to share commissions from the sale of the Robinson Ranch;
(4) Robert and Stokes committed fraud against Burris; (5) Robert and Stokes made a negligent
misrepresentation on which Burris justifiably relied; (6) the sum of $362,500 would fairly and reasonably
compensate Burris for his damages that resulted from Robert's and Stokes's failure to comply with the
agreement; (7) the sum of $362,500 would fairly and reasonably compensate Burris for his damages that were
proximately caused by the fraud; (8) the sum of $417,500 would fairly and reasonably compensate Burris for
damages that were proximately caused by the negligent misrepresentation; (9) Robert and Stokes were part
of a conspiracy to commit fraud that damaged Burris; (10) the reasonable fee for the necessary services of
Burris's attorney is $55,000; and (11) there was clear and convincing evidence that the harm to Burris resulted
from Robert's fraud.
8. The trial court ordered a take-nothing judgment in favor of defendant Seeliger.
9. Hartnett was a lawyer that represented the Firm in the sale of the Robinson Ranch.
10. The appraisals admitted as plaintiff's Exhibits 4 and 5 include: (1) several maps and pictures of the
Robinson Ranch; (2) identification of the property with a description of its exact location; (3) a description of
the property including, among other things, the total acres, the types of soil, the topography, easements and
encumbrances, hazards; and (4) other information useful to a potential buyer. Burris testified that Exhibit 4
was the appraisal of the Jackson and Victoria County properties, while Exhibit 5 was the appraisal of the Hays
County properties.
11. According to Hatfield, "The Realtors Land Institute bestows upon people who have gone through
the educational requirements and have shown the strict requirements as far as number of land sales you have
conducted, et cetera, to bestow upon those people who have gone through that educational process and met
those requirements to be able to be an accredited land consultant."
12. Friend split her share of the commission with Klutts.
13. Stokes testified that he also represented the buyer, SMZ.
14. The trial court admitted the document into evidence, which states:


 Mr. M.H. Brock (Buddy Brock) is the one that I am talking with for and on behalf of the
foundation. Mr. Jim Hartnett Sr. and Jr. are the two that represent themselves, myself, and
two other attorneys involved in partial ownership of the Foundation Property. Mr. Brock gave
me the following information this morning. Mr. Hartnett Jr. gave me the information a day or
so ago, which I immediately passed on to [Robert]. I have always tried to made [sic] sure that
Mr. ________ had the opportunity to have last chance, which the parties have respected at
this point. The above will not be shipped any further and Mr. Brock and Mr. Hartnett, say they
will not seek any other purchasers if your purchaser will sign a contract in a few days.


 The proposal is for a net of $35,000,000.00, no expense to the Foundation or Attorneys who
own with the foundation.

 

 . . . .

 

 I suggest that you call Mr. Jim Hartnett, Jr. or Sr. . . . for deadlines and etc.
15. It is unclear from the record who was the broker for Ranchbuuyers at this time.
16. Klutts testified that Ziechang was Friend's "client."
17. The trial court ordered Stokes to produce any documents that he used to refresh his memory. 
However, on re-direct examination, Stokes explained that there were no documents to produce because when
he referred to documents, "[he was] referring to facts that [he] uncovered that refresh [his] memory during this
week." There are no documents from Stokes in the record showing how he calculated the amount of the wire
transfer to Robert.
18. See Moore v. Sussdorf, 421 S.W.2d 460, 465 (Tex. Civ. App.-Tyler 1967, writ ref'd n.r.e.) ("It is
generally held that an agreement between brokers to work together and share a commission on
consummation of a deal constitutes a joint adventure and is enforceable."); Miller v. Watson, 257 S.W.2d 839,
841 (Tex. Civ. App.-Dallas 1953, writ ref'd n.r.e.) (allowing a broker who had an agreement to "work with or
cooperate with" another broker to collect half of the commission paid to the defendant).
19. According to Klutts, in the second sale, Friend represented SMZ, and Klutts brought in the buyer. 
The two shared two percent of the commission and Stokes received two percent of the commission. When
asked why Stokes was allowed to share in the commission, Klutts replied, "I guess I should have thought
about that more, but [Stokes] met with me. . . .  And [Stokes] drove us [Klutts and the buyer] around in his car
and explained all the details as to the workings of the ranch and getting this done. . . .  And I know it looks like
we probably could have just gotten together and not used [Stokes]. But [Stokes] was working real hard at the
time on the first deal. . . ."
20. See 22 Tex. Admin. Code § 535.148 (2009) (Tex. Real Estate Comm'n, Receiving an Undisclosed
Commission or Rebate).
21. 573 S.W.2d 553, 555 (Tex. Civ. App.-Texarkana 1978), aff'd, 585 S.W.2d 674 (Tex. 1979).
22. Id. at 554 (citing Tex. Rev. Civ. Stat. art. 6573a § 20(a) (Vernon Supp. 1978)) (emphasis added).
23. 944 S.W.2d 631, 633 (Tex. 1997).
24. The Court in Trammel Crow cites the former version of RELA, before the Act's repeal and
recodification in the occupations code. See Tex. Occ. Code Ann. § 1101.806(a)(1) (Vernon 2004). Although
the current section has undergone some changes, it is materially identical to the former version. See Tex. Rev.
Civ. Stat. Ann. art. 6573a, § 20(b) (Vernon Supp. 1997) (repealed 2003) (current version at Tex. Occ. Code
Ann. § 1101.806(c)).
25. We note that section 1101.806 of the occupations code requires that in order to maintain a cause
of action to collect a commission for the sale of real estate, the commission agreement must be in writing. 
See Tex. Occ. Code Ann. § 1101.806(c). However, section 1101.806 does not "apply to an agreement to
share compensation among license holders." See id. § 1106.806(a)(1); Warren v. White, 143 Tex. 407, 185
S.W.2d 718, 720 (1945); see also Insignia Capital Advisors, Inc. v. Stockbridge Corp., No. 05-99-01126-CV,
2000 Tex. App. LEXIS 1649, at *9 (Tex. App.-Dallas Mar. 13, 2000, no pet.) (mem. op.). License holders are
defined as a broker or salesperson of real estate. See Tex. Occ. Code Ann. § 1101.002 (Vernon 2004).
26. Trammel Crow, 944 S.W.2d at 631.
27. See Tex. Admin. Code § 535.148; Perl v. Patrizi, 20 S.W.3d 76, 80 (Tex. App.-Texarkana 2000,
pet. denied).
28. Perl, 20 S.W.3d at 79.
29. Northborough Corporate, Ltd. P'ship v. Cushman & Wakefield of Tex., Inc., 162 S.W.3d 816,
820-821 (Tex. App.-Houston [14th Dist.] 2005, no pet.).
30. See id.
31. See 22 Tex. Admin. Code § 535.148.
32. Id. § 535.148(a).
33. See Northborough Corporate, Ltd. P'ship, 162 S.W.3d at 821.
34. See id.
35. Trammel Crow, 944 S.W.2d at 635.
36. Perl, 20 S.W.3d at 80.
37. Id.
38. Because we have overruled this issue, we need not address appellants' allegation that Burris cannot
recover for breach of contract and the benefit of the failed bargain through a fraud claim because he violated
rule 535.148. See Tex. R. App. P. 47.1.
39. Specifically, Puckett contends the evidence is legally and factually insufficient to support: (1) the
fraud elements of materiality and detrimental reliance; (2) that the fraud proximately caused the damages
awarded; (3) "the existence of a legally enforceable agreement to share commissions on the sale of the
Robinson Ranch with [Burris] regardless of where the commission came from"; (4) a finding that Burris "did
not fail" to "disclose to his client that he intended to receive a commission from a person other than his client
or . . . to obtain the consent of his client to do so"; (5) the amount of damages awarded; (6) the jury's
conspiracy finding; (7) "the jury's finding of justifiable reliance"; and (8) that "the negligent misrepresentation
found by the jury proximately caused $417,500.00 in damages."
40. Specifically, Stokes contends there is legally and factually insufficient evidence: (1) that
"Stokes/CBM proximately caused Burris' alleged damages under any theory"; (2) of detrimental reliance; (3)
"to support recovery for breach of contract against Stokes/CBM"; and (4) that "Stokes/CBM committed fraud,
conspired to commit fraud, or made any negligent misrepresentation to Burris."
41. City of Keller v. Wilson, 168 S.W.3d 802, 810-11 (Tex. 2005).
42. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).
43. Id.
44. City of Keller, 168 S.W.3d at 807.
45. Id. at 827.
46. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).
47. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).
48. Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 211 n.45 (Tex. 2002) (quoting In re FirstMerit
Bank, 52 S.W.3d 749, 758 (Tex. 2001)). 
49. See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998)
("A promise of future performance constitutes an actionable misrepresentation if the promise was made with
no intention of performing at the time it was made.") (citing Schindler v. Austwell Farmers Coop., 841 S.W.2d
853, 854 (Tex. 1992) (per curiam)).
50. Schindler, 841 S.W.2d at 854.
51. Id. (quoting Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986)).
52. Spoljaric, 708 S.W.2d at 434.
53. Id. at 435.
54. In a sub-issue, Stokes argues that at trial, Burris "judicially admitted" that he did not have an
agreement with Stokes when his counsel stated in closing argument:


 The second part of this--of this request Question No. 1 basically deals with whether the
agreement between [Burris] and Robert binds [Stokes]. And we talked about two ways in
those instructions that he could be bound.

 

 One way is through apparent authority. This part right here. The other way is if that party
ratifies the agreement.


According to Stokes, by making these comments, "[a]ny finding the jury may have tried to make that an
agreement existed directly between Stokes/CBM and Burris and that such agreement was breached (Question
3) contravenes Burris' own judicial admission." We disagree. A judicial admission "bars the party admitting
the fact from later disputing its existence." Medina v. Hart, 240 S.W.3d 16, 23 (Tex. App.-Corpus Christi
2007, pet. denied). Here, by explaining to the jury that Question 1 included theories of ratification and agency
as binding Stokes to the agreement, Burris did not "admit" that Stokes did not agree to split his commission
with him. A statement regarding a theory of liability based on ratification or agency by counsel during
argument was not an admission that Stokes did not agree to split the commission with Burris. See Price
Pfister, Inc. v. Moore & Kimmey, Inc., 48 S.W.3d 341, 349 (Tex. App.-Houston [14th Dist.] 2001, pet. denied)
(stating that to be a judicial admission, attorney's statement in closing argument must be "a clear, deliberate,
and unequivocal statement"). Furthermore, a judicial admission must be "contrary to an essential fact
embraced" by Burris. See Medina, 240 S.W.3d at 23. Here, Burris argued that Stokes was liable for
breaching a contract with him. A theory that Stokes was bound by the agreement through an agency theory
or by ratification would not be contrary to any essential fact embraced by Burris--that Stokes agreed to share
his commission with him. Finally, for a statement to constitute a judicial admission, it must be destructive of
the opposing party's theory. See id. Here, Stokes's theory was that he had an agreement to split a
commission with Burris if paid by the seller, but not if paid by the buyer. Whether Stokes's agreement was
based on an agency theory or on a ratification theory does not destroy Stokes's theory of defense. We
overrule Stokes's sub-issue.
55. See Dillard Dep't Stores, Inc. v. Silva, 148 S.W.3d 370, 372 (Tex. 2004) ("[W]hen testimony is
contradictory, credibility is for the fact finder to decide.") (citing Jones v. Tarrant Util. Co., 638 S.W.2d 862,
866 (Tex. 1982)) (per curiam).
56. Appellants argue that there is insufficient evidence to support a finding that Robert "ever realized
a commission on the sale of the ranch to SMZ, and the jury rejected Burris' [sic] argument that he is entitled
to a share of the commission on the subsequent sale." However, no question regarding whether Robert
received a commission on the sale of the property to SMZ or whether Burris was entitled to a share of the
commission on the second sale was submitted to the jury. Therefore, we do not address appellants' argument
as it is not dispositive of this appeal. See Tex. R. App. P. 47.1. Furthermore, the jury heard evidence that
Robert received between $500,000 and $700,000 as commission on the sale of the property and that Stokes
wired $649,500 after the closing on the sales--a total of roughly half of Stokes's commission on both sales. 
Based on this evidence, the jury could have rationally inferred that Stokes shared his commission with Robert
on both sales.
57. See City of Keller, 168 S.W.3d at 807.
58. See id.
59. See Cain, 709 S.W.2d at 176.
60. Stokes also argues that there was insufficient evidence to support the jury's finding that there was
fraud by non-disclosure. The charge allowed the jury to find that Stokes committed fraud if he made a
material misrepresentation or if he failed to disclose a material fact within his knowledge. Because we have
already concluded that there was legally and factually sufficient evidence to support the jury's finding of fraud
based on Stokes's misrepresentation that he would split the commission with Burris, we do not reach this
issue. See Tex. R. App. P. 47.1. 
61. Jenkins v. Entergy Corp., 187 S.W.3d 785, 797 n.10 (Tex. App.-Corpus Christi 2006, no pet.)
(citing Chon Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005)).
62. Romero v. KPH Consol., Inc., 166 S.W.3d 212, 221 (Tex. 2005).
63. See Central Sav. & Loan v. Stemmons Nw., 848 S.W.2d 232, 241 (Tex. App.-Dallas 1992, no writ)
("The gist of a civil conspiracy is the damage resulting from commission of a wrong that injures another and
not the conspiracy itself.").
64. See Greenberg Traurig of N.Y., P.C. v. Moody, 161 S.W.3d 56, 95 (Tex. App.-Houston [14th Dist.]
2004, no pet.) (" It is well-settled law that upon joining a conspiracy, a defendant becomes a party to every act
previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy.") (citing
State v. Standard Oil Company, 130 Tex. 313, 107 S.W.2d 550, 560 (1937); Bourland v. State, 528 S.W.2d
350, 354 (Tex. Civ. App.-Austin 1975, writ ref'd n.r.e.).
65. See City of Keller, 168 S.W.3d at 807.
66. See Cain, 709 S.W.2d at 176.
67. See Smith v. Caldwell, 754 S.W.2d 692, 693-94 (Tex. App.-Houston [1st Dist.] 1987, orig.
proceeding) ("All conspirators are jointly and severally liable for wrongful acts done in furtherance of the
conspiracy.").
68. See Tex. R. App. P. 47.1.